**OZARK AIR LINES, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
**Respondent.**

**No. 20543.**

United States Court of Appeals,
Eighth Circuit.

May 5, 1971.
Rehearing Denied June 2, 1971.

Paul L. Bradshaw, Thom G. Field, Neale, Newman, Bradshaw & Freeman, Springfield, Mo., for petitioner.

Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, Richard W. McLaren, Asst. Atty. Gen., Gregory B. Hovendon, Harry First, Attys., Dept. of Justice, R. Tenney Johnson, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Robert L. Toomey, Allen R.

Frischkorn, Jr., Attys., C. A. B., Washington, D. C., for respondent.

Before ALDRICH,* LAY and BRIGHT, Circuit Judges.

ALDRICH, Circuit Judge.

This dispute between Ozark Air Lines, Inc. and the Civil Aeronautics Board can be reduced to a relatively simple basic issue. Ozark, and a number of other so-called local service airlines in other parts of the country, for years have required subsidization, determined by "need." Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1376(b). Prior to 1961 this was effected on an individual basis, but the resulting problems led to the adoption of a uniform rate structure. See Local-Service Class Subsidy Rate Investigation, 34 C.A.B. 416 (1961). This general formula was altered from time to time. For the year 1966 it was known as Class Rate III–A. Investigation of the Local Service Class Subsidy Rate, Orders E–23697, May 18, 1966, and E–23850, June 23, 1966. This required, if operations proved to be profitable after taxes, a partial repayment of the subsidy, to effect profit sharing between the airline and the government. Taxes were to be those reported, "with such amendments and revisions *as may have been filed* as of the final determination of profit sharing hereunder." (Emphasis added.)[1] Ozark made a profit in 1966, and incurred a tax. In 1969 it operated at a loss. This gave it a loss carry-back, which could be used to reduce its 1966 tax, and hence increase its 1966 profit as measured under the order. The Board, still in the process of determining the amount of profit-sharing for 1966 when the information for 1969 became available, calculated the tax adjustment to which Ozark was entitled, and therefore required a larger profit-sharing refund to the government. Local Service Class Subsidy Rate, Subsidy Refunds, Order 70–3–92, March 18, 1970; Order Determining Subsidy Refund Order 70–5–107 May 21, 1970. Ozark objects.

■ Ozark's complaint is that the Board had no right to consider its potential tax reduction in 1966 resulting from the 1969 losses. Its first reason is that when the Board took March 18, 1970 as the final determination date for the refund due from 1966, Ozark's tax return for 1969, showing a loss, had not in fact been filed, Ozark having obtained an extension of the March 15 filing date. Consequently, Ozark says, even if the Board could properly take March 18, 1970 as the date of final determination of profit sharing, by considering a return that had not yet "been filed" it departed from the terms of the general order, quoted ante. To this the Board replies that all of the information it used had already been supplied in reports that Ozark had been obliged to file with it, including a "pro forma" tax return, the correctness of which Ozark concedes. These reports, the Board found, showed that the tax credit would in fact be claimed. Hence, for Ozark to escape the consequences of its known, actual tax credits by the simple process of obtaining the consent of the Internal Revenue Service not to file on time, even if done in good faith and for other purposes, would be to "ignore reality." We cannot but agree. This is a case for the application of the rule that if literal use of language leads to "absurd results" in the light of a provision's obvious purpose, the purpose must control. United States v. American Trucking Ass'ns, Inc., 1940, 310 U.S. 534, 543–544, 60 S.Ct. 1059, 84 L.Ed. 1345. Ozark's "need" of a subsidy is not to be determined by formalisms.

■ Alternatively, Ozark contends that the Board improperly selected March 18, 1970 as the date of final determination of the 1966 profit sharing, and that if an earlier settlement date had been selected its carryback loss would not have accrued and its net profit for 1966, in

---

* Of the First Circuit, sitting by designation.

1. Investigation of the Local Service Class Subsidy Rate, Order E–23850, June 23, 1966, § III–E–1.

which the government was entitled to share, would not have been enhanced. More exactly, at an earlier date the parties would not have known that the profit was going to be enhanced by a tax reduction derived from net losses in 1969, and the Board, by closing the books, would have foreclosed the government's right to share in the increased profits when in due course they ultimately accrued.

Ozark's argument for "ignoring reality" in this respect is somewhat more sophisticated but, we believe, equally fallacious. It is true, as Ozark points out, that consistent with orderly procedure, the Board attempts to make a final determination with respect to each year— and each airline—as promptly as possible, and that benefits accruing after the final determination need not then be shared with the government.[2] With regard to 1966 a dispute arose between Ozark and the Board's staff as to an unrelated matter affecting the profit-sharing determination, which greatly postponed the settlement date. But for this dispute there would have been a final settlement before the 1969 losses occurred and generated the carryback, and Ozark would have been able to retain the entire increase. The difficulty with this argument is that while application of Class Rate III–A could result in windfalls, it adopted an "actual tax" policy[3] under which the Board computed the tax as accurately as possible on the basis of the facts as known at the time that all other disputes were resolved and the case was ready for closing. It looks to the true facts, in other words, in each case, so far as it is possible to determine them, without speculating, and without delaying longer than other circumstances require.[4] This practice not only seems reasonable, it costs the airline nothing in terms of the true facts. All that Ozark can say is that had the formula provided for an earlier fixed date, or had there not been in this case another dispute, it would have received a windfall. We see nothing arbitrary about this loss. Nor does the circumstance that the Board ultimately overruled its staff, so that

---

2. This follows from the language of Class Rate III–A, as quoted ante.

3. Western Air Lines, Inc., and Inland Air Lines, Inc., Mail Rates, 14 C.A.B. 243, 251–55 (1951), aff'd in relevant part sub nom. Summerfield v. CAB, 92 U.S.App. D.C. 248, 207 F.2d 200, aff'd sub nom. Western Air Lines, Inc. v. CAB, 347 U.S. 67, 74 S.Ct. 347, 98 L.Ed. 508.

4. We can do no better than quote the Board.

"The Board is here applying a policy it has consistently applied to all carriers similarly situated. That policy is to predicate the tax allowances on the basis of the carrier's actual income tax liability so far as it is known at the time of the Board determination. The Board has always been aware of the fact that in the normal course of administration of tax laws, the carrier's taxes for a given year are subject to change after our determination has been made final. But it would be totally infeasible to attempt to hold open each case until all possibility of amendment to the carrier's tax returns for that year had passed. Taxes can be affected by carryback credits, by voluntary amendments of returns by the taxpayer, and by deficiency assessment of the Internal Revenue Service, and were we to deter our final action on return and profit-sharing matters until the various statutory limitation periods expired, it would be virtually impossible to maintain carriers on a current rate status and there would be continual uncertainty as to the government's obligations under section 406, as well as uncertainty as to the carrier's revenues. It is for these reasons that the Board has followed the practice of relying upon the tax returns on file as of the date of finalization of the rate or profit-sharing case. In this manner, both the carrier and the Board are bound to the facts then existing. Subsequent changes in the tax allowance may work to the carrier's benefit or to its detriment, and the carrier takes the risk that a subsequent deficiency assessment by Internal Revenue Service will occur in a closed rate period and will not be underwritten under section 406. By the same token, tax refunds for the year become beyond our reach if they occur during a closed rate period."

Local Service Class Subsidy Rate, Subsidy Refunds, ante.

**896**

Ozark won the other dispute, call for a different result. There is no suggestion that the staff was acting other than in good faith.[5] That the staff proved to be wrong no more calls for ignoring the then-known realities of Ozark's tax position than does the fact that Ozark chose to delay the filing of its tax return.

Finally, Ozark contends that the Board's selecting a different date for it than for some other lines [6] enjoying the benefits of Class Rate III–A subsidies caused inequalities in results, and was so arbitrary as to violate due process. This raises two questions: what are the disadvantages of a different rule governing the time of determination, and how serious is the occasional divergence in result called for by the present one? To take the second question first, while the matter was not gone into, Ozark conceded in oral argument that it was not in competition with the other local service airlines. There is hence no pressing obligation that in any particular year they should all receive equal treatment, so long as there is general fairness.

As to the alternatives open to the Board, Ozark has suggested two.

"First. It could have delayed the final determination of any carrier's 1966 subsidy until all carriers had been processed so that simultaneous determinations could be made for all; * * *"

That all carriers should have to wait to know what their subsidies are to be until the last argument between the Board and the last carrier has been finally settled— it may be noted that after five years this one has not been settled yet—seems so unreasonable as to cause wonder why it should be advanced.

Ozark's second suggestion is that it would be fairer to have an arbtrarily fixed, identical, settlement date for all

airlines as to the effect of taxes on the calculation of "profit." Certainly this would not help lines that had already reached agreement with the Board before that date had arrived to achieve the final certainty that all parties agree is desirable. Nor could it lead to early certainty with respect to other lines which, by hypothesis, were still engaged in disputes. Nor, in terms of windfalls, is it necessarily to an airline's advantage to have an early settlement date. As the Board pointed out, n. 4, ante, the windfall, if any, resulting from an earlier settlement date may benefit the government. Had there been a tax deficiency established with respect to 1966 in this case, rather than a loss carryback, the carrier would have benefitted rather than lost by the delay. In this respect the "gamble" resulting from a differentiation in settlement dates, dictated by independently good reasons, is applicable to all alike. We see nothing illegal or arbitrary about Class Rate III–A, or the Board's procedure thereunder.

Affirmed.

5. Ozark states in its brief,

"We recognize, of course, that all carriers cannot be processed simultaneously. And we do not claim that the Board has failed to act as expeditiously as possible under the circumstances or that the Board has intentionally process-

ed the carriers in such order as to help or hurt any particular one."

6. The March 18, 1970 order affected a number of local service carriers, but some others, with whom there had been less extensive disputes, had had their 1966 subsidies previously determined.