**ALLEGHENY AIRLINES, INC.,**
**Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
**Respondent.**

No. 14892.

United States Court of Appeals,
Fourth Circuit.

July 27, 1972.

Rehearing Denied Sept. 12, 1972.

William C. Burt, Washington, D.C. (Leon M. Kestenbaum and Koteen & Burt, Edwin I. Colodny, Washington, D.C. on brief), for petitioner.

Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, Civil Aeronautics Board (O. D. Ozment, Deputy Gen. Counsel, Robert L. Toomey, Allen R. Frischkorn, Attys., R. Tenney Johnson, Gen. Counsel, Civil Aeronautics Board, and Richard W. McLaren, Asst. Atty. Gen., Gregory B. Hovendon, and Harry First, Attys., Dept. of Justice on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and BOREMAN and RUSSELL, Circuit Judges.

HAYNSWORTH, Chief Judge:

The problem presented arises out of the subsidization of local service airlines and the application of shifting rules to recoup excessive subsidy payments. Allegheny was ordered to refund some $916,000 of such payments upon the application of a remnant of a rule stripped of the counterweight that initially had made it reasonably fair and equitable. On Allegheny's petition under the Administrative Procedures Act,[1] we find the order of the Civil Aeronautics Board arbitrary and unenforceable.

---

1. 5 U.S.C.A. § 701 et seq.

The Federal Aviation Act, § 406(b)[2], provides that mail rates for air carriers shall be fixed after consideration of the need of each carrier for compensation, considering its other revenues, to enable it to provide postal and other services in the interest of commerce and the national defense. A specific purpose was the maintenance and expansion of local air service which could not be supported by local passenger revenues. It has been judicially declared that "[t]he objective is on a grand scale. It is for the public interest. It is vital."[3] The Supreme Court has recognized the relationship between such "needs" of the carriers and the public purposes as declared by the Congress.[4]

Quite appropriately, however, such a program for subsidization of uneconomic operations was accompanied by provisions for post-audit review and recapture of subsidy payments to the extent they then appeared excessive and unnecessary. Until 1967, the governing principle was recomputation, under the Board's own rules, of profits after taxes and a recoupment of excessive profits. Beginning January 1, 1967, however, the old principle of profit sharing was replaced by a new formula of passenger revenue growth sharing. On the theory that increases in passenger revenues would be reflected in profits, the new rule provided for a reduction in subsidy in an amount equal to 15 per cent of the increase in passenger revenues in the subsidy year over those in a base period.

Unfortunately, the theory, in its application to local service airlines, promptly proved unfounded.[5] Those carriers had net profits in 1965 and 1966. They suffered increasing net losses in 1967, 1968 and 1969, despite substantial increases in net passenger revenues. The result was a reduction in subsidies as profits were turned into growing losses.

The issue here, however, is not the legality or the reasonableness of computing subsidy reductions on the basis of increases in passenger revenues, rather than upon profits. The issue is the reasonableness of attributing tax refunds from losses incurred after 1966 to earlier profitable years when the standard was profit sharing, not revenue sharing.

Before 1961, the Board separately determined each carrier's subsidy and subsequent adjustments based upon its profits, including subsidy, after taxes. Each year was viewed without reference to other years, and tax refunds attribuable to losses in subsequent years and allowable under the Internal Revenue Code[6] were not recognized as an adjustment to income taxes payable with respect to profits earned in the year under review.[7] In 1961, however, the Board shifted to class rates and adopted a version of the Internal Revenue Code's loss carryback provision. Thereafter, subsidy for all local service carriers was determinable on the basis of a Board-developed formula taking into account many factors, including seat-miles flown, total departures, length of flights and other matters affecting operating income and costs. The basis of the post-audit adjustment, however, remained essentially the same, except that tax refunds attributable to losses in subsequent years would now be carried back to the audit year if the availability and amount of that carryback was known when the Board closed the books of that carrier with respect to that audit year. However treated for income tax purposes, subsequently determined loss carrybacks to tax obligations in the audit year were accountable, for subsidy pur-

2. 49 U.S.C.A. § 1376(b).

3. American Overseas Airlines, Inc. v. CAB, 103 U.S.App.D.C. 41, 254 F.2d 744, 748.

4. Western Air Lines, Inc. v. CAB, 347 U.S. 67, 74 S.Ct. 347, 98 L.Ed. 508; Delta Air Lines, Inc. v. Summerfield, 347 U.S. 74, 74 S.Ct. 350, 98 L.Ed. 513.

5. For a number of reasons, some of which were unanticipated, costs rose more rapidly than gross passenger revenues.

6. 26 U.S.C.A. § 172.

7. See Trans World Airlines, Inc. v. CAB, 128 U.S.App.D.C. 126, 385 F.2d 648, 669–670.

poses, in the year in which the tax adjustment was made.[8]

This scheme may have had a general tendency to reduce subsidy costs to the United States, but the only matter at issue was *when* a tax refund would be treated as an addition to income for subsidy purposes. If not carried back under the Board's rules, it would be treated as an addition to income in the subsequent year. That this was not a matter of major significance in the regulatory scheme is suggested by the fortuitous application of the Board's rule that a tax refund would be carried back to an earlier profit year if known when the Board closed its books on the profit year, but otherwise would be accountable as an addition to income in the year of its receipt.[9] The rule had the advantage of avoidance of delay in the conclusion of subsidy redeterminations, and rough justice remained as long as the principle of profit sharing prevailed and the rule's operation only affected the time when tax refunds were to be taken into account as income additions for subsidy purposes.

Beginning with 1967, however, the Board completely abandoned profit sharing as a method of subsidy recapture. The new formula, as we noted earlier, was hinged entirely to increases in gross passenger revenues. While it was thought, erroneously as it turned out, that such increases would be reflected in profits, profit computations and tax adjustments became entirely irrelevant. Under the new class rates, there were no rules for determining the year in which a refund of taxes was to be treated as an addition to income, including subsidy, for no such computation was to be made.

Though the subsidy recapture scheme of Class Rate IIIA had been completely replaced by a new, quite different, self-contained plan, the Board took the position that § III(E) (1) of Class Rate III survived and required that tax refunds from losses in subsequent years be carried back to 1966 as an addition to income in that year. It continued, too, the administrative rule that the carryback was requisite only if the amount of the refund was determinable at the time of its administrative closing of that carrier's 1966 audit year. Since the Board did not, and could not, close the 1966 audit year of each carrier simultaneously, some were ordered to refund 1966 subsidy because of tax refunds attributable to 1969 losses, while others were not.[10] There was no change to tentative determinations, subject to later adjustment, so that all carriers would be placed on a comparable basis.

Though we share the expressed discomfort of the judges of the District of Columbia Circuit in the face of this inequality of treatment of small air carriers in similar circumstances, we would agree with them and the judges of the Eighth Circuit[11] that this disparity in treatment would not warrant our ruling that a disfavored carrier must be restored to the position of the favored carriers whose 1966 audit years were closed before tax refunds were determinable, for the assumption would be that the favored carriers had simply obtained windfalls. They do not appear to be in competition with each other, and if an agency permits some to receive

8. *See* Class Rate IIIA, section III(E) (1).

9. The counterbalancing adjustments in the profit and loss years are not hypothetical in the scheme of profit sharing even with respect to refunds under 26 U.S.C.A. § 172. Many deductions allowable for income tax purposes were not allowable for subsidy purposes. Income tax losses and subsidy profits, subject to sharing, could be realized by a carrier in the same year, and some of the airlines had that experience. Indeed some of the litigation over collateral questions in this field arose out of such loss-profit years. *See* Western-Inland Mail Rates Case, 14 C.A.B. 243; Trans World Airlines, Inc. v. CAB, 128 U.S.App.D.C. 126, 385 F.2d 648.

10. *See,* Texas International Airlines, Inc. v. CAB, D.C.Cir., 458 F.2d 782; Ozark Air Lines, Inc. v. CAB, 8 Cir., 441 F.2d 892.

11. *See,* footnote 10, *supra.*

windfalls at public expense, it is not required to give windfalls to others. Here we deal with a more fundamental problem, however, for we are persuaded that the favored carriers received no windfall and the disfavored ones have received less than their due.

In normal accounting practice, income items are taken into income in the year of their receipt or accrual. Tax refunds from loss carrybacks may be accrued in the loss year and received later. In the tax scheme, such a refund is related to taxes paid in an earlier year, but when treated as an income item for subsidy purposes, it clearly was unaccrued until the close of the subsequent loss year. It was perfectly natural, therefore, for the Board, as it did until 1961 to take such refunds into account in the year of their receipt or accrual. The changes in 1961 did no great harm, for in a continuing system of profit sharing as a means of subsidy recapture, a rule attributing an income item to an earlier year if ascertainable at the time of the audit, but otherwise to the year of its receipt or accrual, affected only matters of timing. Every carrier was held accountable for tax refunds, and if one was missed in one year it would be picked up in another.

The rough justice which prevailed as long as profit sharing remained in vogue was lost when the Board turned to a completely different method of subsidy recapture. No longer was the issue a relatively trivial question of when a carrier would be held accountable; it became a question of whether it would be held accountable, and that much larger question was greatly exacerbated by the Board's resolution which held some carriers accountable while others were not.

■■■ When the Board abandoned profit sharing and turned to a new system of subsidy recapture in which profits and losses were irrelevant, it could no longer reasonably insist that an item of income, accruing in a later year

when income was irrelevant for subsidy purposes, be attributable to an earlier year in which it was. It was unreasonable and arbitrary for the Board to conclude, as it did, that Allegheny was accountable in 1966 for income items which demonstrably had not accrued by the end of that year and were not to accrue until much later.

The Board principally supports its position by reference to its "actual tax policy." This was enunciated in its Western-Inland Mail Rates Case.[12] There, carriers contended that expenses, claimed and allowed for income tax purposes, but which had been disallowed by the Board for subsidy recomputation purposes, should be reduced by the income tax increment. The carriers thought that if the Board, for subsidy recomputation, was to disallow expenses deductible on income tax returns, the income taxes paid allowance should be increased to the amount which would have been payable if the Internal Revenue Service had disallowed the same deductions. The Board's answer, of course, was that, for subsidy purposes, profit after taxes was to be determined on the basis of taxes actually incurred, rather than upon a hypothetical recomputation on the basis of elimination of subsidy unallowable, but income tax allowable, expense deductions.

That policy of prevention of hypothetical tax allowances has nothing to do with this case. The realism which led the Board to conclude that income tax paid credits should not be increased by amounts which might have been exacted if the Internal Revenue Service had viewed the scene from the Board's perspective does not begin to justify Board reallocations to an audit year of income items which did not accrue until years later.

For income tax purposes, of course, it is true that losses in later years are fictionally "carried back" to profits in earlier years, or "carried forward" to

12. 14 C.A.B. 243.

profits in later years.[13] For revenue purposes, the provision of permissible income averaging is a mitigation of the harshness of annual income tax accounting, but all of that has little or nothing to do with subsidy recomputation unless the subsidy provisions have the purpose and *effect of subsidy averaging.* No such purpose or effect can be found when the rules are so changed that the question is no longer *when* a carrier shall be accountable for an income item, but *whether* it will be after substitution of a system which allocates no credits or charges to income items or deductions. The "actual tax" policy, which forecloses hypothetical income tax computations eliminating allowable tax deductions, does not require, if it does not foreclose, hypothetical reallocations of income to years in which it could not conceivably have accrued. An actual tax policy may tolerate fictional reallocations of income items from one year to another in a continuing system of consistent principles, but, when the rules are changed, fictional attribution of unaccrued items to previous years is not required by any such policy.

Literally, but superficially, a tax refund resulting from carrying losses back to earlier profit years is a refund of taxes paid on profits earned in the earlier years, but, in a context of treatment of such refunds as income additions, it is much more relevant to remember that the refunds resulted from losses in the later years and cannot conceivably be said to have been earned in the earlier profit years. An "actual tax policy" against hypothetical computations to claim credit for taxes which have not been paid and will not be paid cannot legitimate the reallocation of income items to earlier years before their accrual.

Finally, the Board finds comfort in the fact that § II of Class Rate III contained a provision that should the Rate be terminated before the end of a calendar year and not superseded by another profit sharing formula, the profit sharing provisions would be applicable to that part of the year ending with the Rate's termination, with adjustments to eliminate seasonal distortion. That provision gave notice that *profit sharing for subsidy recapture* might not endure forever, but there is nothing in it to suggest that the Board might seek to project terminated profit sharing provisions into later years to cover income items earned after a different and inconsistent formula had been made effective.

For these reasons, we conclude that the Board's allocation to profit sharing years of income items accruing in later revenue sharing years was unreasonable and impermissible and that its order requiring Allegheny to refund subsidy payments made in 1965 and 1966 is unenforceable.

Order set aside.

*Addendum on Petition for Rehearing*

In a petition for rehearing, the Civil Aeronautics Board informs us that we were mistaken in stating that its policy of adjusting tax deductions was adopted with the change to class rates in 1961. That had been its policy in the individual subsidy determinations since 1951, it says. We accept the correction, and the opinion should be read accordingly, but this obviously has no bearing on the result.

More importantly, the Board takes issue with our treatment of the tax adjustment as an income item and our statement in Footnote 13 that the Board did not seek to carry back losses; it sought to carry back tax refunds.

As a ritualistic formalism, the Board is correct, but that does not alter our view of the substance of the matter.

In form, losses in the subsequent years were carried back to the years in question for tax recomputation, but for no

13. The Board, of course, did not seek to carry losses back to 1966; it sought to carry tax refunds back.

other purpose. Losses were not carried back to reduce net profit before taxes, and hence to reduce subsidy recapture; they were carried back solely for the purpose of reducing the deduction for income taxes paid and hence to increase net profit after taxes.

In the context of subsidy recapture, since losses in the subsequent years were not carried back for all purposes and since the tax recomputation resulted in a reduction of the taxes paid deduction in an amount equal to the refunds received in the later years, the substantive effect of what was done was a carryback of tax refunds, not of losses.

We think our view of the substance of the matter was the proper one. We adhere to our view that after abandoning profits as the basis for and the measure of subsidy recapture, profits and losses in subsequent years became irrelevant for all purposes, and tax refunds attributable to losses in subsequent years should not have been used to increase profits in prior years.

The petition for rehearing is denied.