## GRUMMAN AEROSPACE CORPORATION

v.

### The UNITED STATES.

No. 71–76.

United States Court of Claims.

Nov. 15, 1978.

Gene Perry Bond, Washington, D. C., atty. of record, for plaintiff; Robert P. Murphy, Chapman, Duff & Paul, Washington, D. C., Raphael Mur and Robert W. Ballin, Bethpage, N. Y., of counsel.

Anthony Thompson, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant; David S. Eisenberg, Washington, D. C., of counsel.

Before DAVIS, Judge, Presiding, NICHOLS and SMITH, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's request for review of the recommended decision of Trial Judge Harry E. Wood, filed October 25, 1977, pursuant to Rule 166(c), on the parties' cross-motions for summary judgment, having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the Court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the said decision as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE *

WOOD, Trial Judge: In this action, before the court for review under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1970), plaintiff, an operating subsidiary of the Grumman Corporation ("Grumman"), challenges as legally erroneous and unsupported by substantial evidence an adverse decision by the Armed Services Board of Contract Appeals.[1]

The decision under review involved a portion ($90,737) of what plaintiff calls a "state income tax credit" (and the Board called a "franchise tax refund") of some $1,500,000, plaintiff's allocable share of a slightly larger amount received by Grumman in 1972 in consequence of a claim for credit or refund of New York State corporation franchise tax paid for the year 1968. The claim for credit or refund resulted from carry-back of a substantial net operating loss, realized by Grumman in 1971, to 1968, in which year there was sufficient income to absorb the entire loss.

What was at issue before the Board, and what is at issue here, is not whether plaintiff was contractually obligated to allocate to defendant some portion of the credit or refund it received in 1972, but whether that credit or refund is to be allocated to contracts on the basis of the participation of those contracts in plaintiff's 1968 General and Administrative expense (G&A) input base or, as plaintiff contends, on the basis of the participation of those contracts in plaintiff's 1971 G&A input base.

In rejecting plaintiff's argument for allocation to 1971, the Board held that the "tax refund" was a "reduction of [plaintiff's] 1968 franchise tax liability" and a "restitution of a portion of the tax paid in 1968, for which [plaintiff] had been reimbursed by the Government in the proportion the Government's cost reimbursement contracts had been charged with [plaintiff's G&A] expenses in that year"; that the "refund is 'properly allocable' to the 1968 tax payment * * * * "; and that it should be credited to those "various contracts on the same basis as they were charged with the original 1968 tax payment." *Grumman Aerospace Corp.*, ASBCA No. 18590, 75–2 BCA ¶ 11,492, at 54,831.

The essence of plaintiff's position herein appears to be that the Board erred (1) in not finding the defendant estopped from applying the 1972 credit or refund to 1968, rather than 1971, overhead, and (2) in not holding that the credit or refund was "only properly allocable to 1971". Defendant contends that to the extent questions of estoppel are properly before the court,[2] that doctrine is of no avail to plaintiff, and that the Board decision allocating the credit or refund to 1968 is supported by substantial evidence and legally correct.

The basic facts underlying this controversy, detailed hereinafter, are largely undisputed.[3] For reasons which will appear, it is concluded that plaintiff is not entitled to recover.

### I

The contract here involved (N00019–67–C–0078, also called the EA–6B contract) originated as a letter contract offered to the Naval Air Systems Command by Grumman Aircraft Engineering Corporation ("GAEC") July 26, 1966, and accepted by the Naval Air Systems Command August 5, 1966. That letter contract was superseded January 19, 1968, by a definitized cost-plus-incentive-fee contract. On June 30, 1969, as a result of a corporate reorganization,[4] a

---

* The opinion and recommended conclusion of law are submitted pursuant to Rule 166(c). The necessary facts are stated in the opinion.

1. *Grumman Aerospace Corporation*, ASBCA No. 18590, 75–2 BCA ¶ 11,492.

2. Defendant suggests a failure "to raise timely the estoppel issue", and urges that such issues not raised administratively should not now be considered.

3. Plaintiff does assert, however, that the Board failed to make some essential findings of fact, and that certain findings made were incomplete.

4. In the process, GAEC became Grumman Corporation.

novation agreement between defendant, GAEC, and plaintiff, was executed. Pursuant to that agreement, the EA–6B contract, which required GAEC to modify three government-furnished A6A aircraft to add all-weather electronic countermeasures, to manufacture five preproduction EA–6B aircraft, to flight test the said aircraft, and to provide (among other things) training, special support, and engineering and technical services, was transferred from GAEC to plaintiff. The last aircraft to be supplied under the terms of the EA–6B contract was delivered in March 1970.

In and after 1968, New York State imposed a "State Franchise Tax on Business Corporations", requiring that the amount of tax due be determined following a series of calculations: one on the basis of the taxpayer's "entire net income"; one on the basis of business and investment capital; and one on the basis of "entire net income" plus payments to certain officers and shareholders. The tax due was the largest of these amounts, except that payment of a statutory minimum (a flat fee of $125) was in any event required. An additional tax computed on the basis of the portion of the taxpayer's "subsidiary capital allocated within the state * * *" was also called for.

In and after 1968, a New York State statute provided that a "net operating loss deduction shall be allowed which shall be presumably the same as the net operating loss deduction allowed under section one hundred seventy-two of the internal revenue code of nineteen hundred fifty four * * *." Under this provision, net operating losses could be carried back for 3 years or carried forward for 5 years. *Cf. United States v. Foster Lumber Co.*, 429 U.S. 32, 97 S.Ct. 204, 50 L.Ed.2d 199 (1976).

In and after 1968, the New York State franchise tax on business corporations was an element of G&A expense to Grumman. Grumman's G&A expense pool was allocated to individual contracts on the basis of

their total cost input (direct labor, direct material, and manufacturing and engineering overhead costs). Grumman paid a New York State corporation franchise tax of $1,807,870 for 1968, according to the Board.[5] That defendant reimbursed plaintiff for the amount of that payment properly allocable to the EA–6B contract here in suit is clear.

It is also important to note, since in the last analysis it underlies and is responsible for this litigation, that during 1968, a substantially greater proportion of Grumman's government contract business was in cost-type contracts than was the case in 1971. The actual percentages for each year are as follows:

| Type of Contract | Percentage Participation in Allocation Base | |
| --- | --- | --- |
| | 1971 | 1968 |
| Cost Type | 14.22% | 39.77% |
| FPI | 63.06 | 20.14 |
| FFP & Other | 22.72 | 40.09 |

## II

In 1969, plaintiff (or GAEC, as its corporate predecessor) entered into a contract with defendant described by the Board as follows:

The contract * * * was a total package procurement calling for the design, development, test, and evaluation of an aircraft which became known as the F–14 Tomcat. The contract also called for the production of a specified number of aircraft and contained options for the Government to purchase additional quantities. This contract was of the fixed price incentive fee variety so that up to a point costs were paid by the Government. Between that point and a ceiling the costs were shared between the Government and the contractor, but over the ceiling all costs were borne by Grumman.

In its Annual Report for 1971, Grumman reported a net loss, after "Provision (credit) [of $18,200,000] for Federal taxes on income", of $17,989,580, and a substantial estimated pretax loss on the contract, entered into in 1969, for the F–14 aircraft. In the

---

**5.** The 1968 New York State franchise tax return, filed in the name of GAEC, reflects a tax due of $1,889,163.71. The figure stated in the text appears in Grumman's 1972 claim for credit or refund of corporation tax paid, referred to hereinafter.

words of the Annual Report, the said loss was reflected on Grumman's books by a writedown of "its F–14A inventories to realizable values by a charge to earnings in 1971 of $65,000,000, before tax adjustments, representing the estimated loss which will be incurred in the performance of the work now required by its contract for the F–14A Tomcat aircraft."

The Board found that the said writedown of the F–14 inventories to realizable values in 1971 was in accordance with generally accepted accounting principles (requiring that a loss be reported in the year in which it is realized), that the F–14 contract "gave rise to the loss in question here \* \* \*", and that "Likewise, the reporting of the tax credits resulting from the recognition of the loss in the 1971 financial statement was in accordance with APB No. 11, paragraph 44", Accounting for Income Taxes, December 1967.[6] Those findings deserve finality.

In early 1972, Grumman filed with the New York State Corporation Tax Bureau, Form CT–8, "Claim for Credit or Refund of Corporation Tax Paid \* \* \* for period ended December 31, 1968." The said Form CT–8 reflected that Grumman (formerly GAEC) had paid a tax of $1,807,870 for 1968, and requested a "credit or refund" (hereinafter "credit") of $1,590,888 (computed by deducting from the amount of tax paid for 1968 the sum of $216,982, the minimum tax payable for 1968).[7] In mid-1972, in consequence of the filing of the Form CT–8, Grumman received from the State of New York a credit or payment of $1,609,000 (including interest). The Board found that the credit "was caused or generated by application of the net operating loss carryback from appellant's 1971 fiscal year to its

1968 net income which had formed the basis for the computation of the franchise tax in that year." Neither party questions that finding here.

After Grumman received the New York State tax credit or payment, it recognized that since the New York State franchise tax had been and was an element of G&A expense, the credit had to be applied to contracts, and in a particular time frame. Considerable internal study of the problem followed,[8] and, by memorandum dated August 4, 1972, Grumman advised the resident auditor, Defense Contract Audit Agency ("DCAA"), that it proposed (1) to allocate the credit to its various subsidiaries (including plaintiff) on the basis of the proportion of the net income or loss of each of them to the entire loss, in accordance with Grumman's prior practice, and (2) to determine and apply the credit "to individual contracts \* \* \* using the 1971 G&A base."

In accordance with the first element of the foregoing advice, Grumman allocated $1,538,585 of the credit it had received in 1972 to plaintiff. The Board did not, and defendant does not now, question the propriety of *that* allocation. Grumman's proposal to apply the credit to individual contracts using a 1971 G&A base was, however, rejected by DCAA. That agency asserted that the credit should be allocated to contracts on the basis of 1968 mix when, as noted, Grumman had a greater proportion of cost-type government contracts than it did in 1971. When plaintiff refused to accede to DCAA's position, DCAA's resident auditor issued a DCAA Form 1, "Notice of Contract Costs Suspended and/or Disapproved". Insofar as DCAA Form 1 pertained to the EA–6B contract here involved,

---

**6.** APB Opinion No. 11 was promulgated by the Accounting Principles Board, American Institute of Certified Public Accountants. The Board opinion suggests, and the evidence abundantly establishes, that such opinions, where applicable, amount to important requirements in the accounting profession, and that accountants depart from such opinions only at very substantial personal risk. See *Merritt-Chapman & Scott Corp. v. United States*, 528 F.2d 1392, 1398, 208 Ct.Cl. 639, 651 (1976).

**7.** A small subsidiary capital tax was added in arriving at the "Total Tax" due. The 1968 minimum tax due was, in essence, computed on the basis of "Allocated Business Capital".

**8.** While the Board did not specifically so find, the facts stated in the text are derived from clear and undisputed evidence in the record. Accordingly, their inclusion herein is appropriate. *Merritt-Chapman & Scott Corp. v. United States, supra.*

the amount of costs disapproved was $90,-737.[9] Plaintiff timely appealed that decision to the Board,[10] was unsuccessful there, and now seeks reversal of that administrative denial of its claim.

### III

■ At the outset, plaintiff contends that the Board erred in failing to hold that defendant was estopped from allocating the credit to 1968, asserting that there was mutual agreement, during 1971 contract negotiations, "that any state income tax credits received for 1971 would be considered as credits to [plaintiff's] 1971 overhead costs", and that, commencing in 1969, DCAA had approved what plaintiff terms its method of contract cost allocation or its practice of state tax allocation for defense contracts under the profit or loss allocation system. The Board made no findings on, and did not discuss the matter of, estoppel.

All else aside, plaintiff's view of the facts respecting the alleged 1971 mutual agreement is an insupportable one. The administrative record is clear that not even plaintiff gave any thought to the question of the application of the credit to a time frame until after receipt of the credit in mid-1972. Proof that there was a shared "assumption" that the credit would be applicable to 1971 overhead, that defendant changed "its F–14 negotiation and settlement position on state income tax allocation retroactively", or of reliance by plaintiff on governmental representations respecting state franchise tax allocation to 1971, as plaintiff asserts, is wholly lacking. No basis for holding defendant estopped from allocating the credit to 1968 on this ground has been shown. *Rel-Reeves, Inc. v. United States*, 534 F.2d 274, 296–97, 209 Ct.Cl. 595, 636 (1976); *H & M Moving, Inc. v. United States*, 499 F.2d 660, 667–68, 204 Ct.Cl. 696, 710 (1974).

In connection with the second prong of plaintiff's estoppel argument, it is worthy of note that plaintiff's statement of questions presented to the Board mentioned estoppel not at all, and that the only explicit reference to that doctrine in plaintiff's presentations to the Board appears in the "Conclusion" section of its post-hearing brief, as follows: " * * * the Government is estopped from negotiating costs on one basis and determining allowable cost at the same time on another." That oblique statement was obviously directed to the premise, held herein to be erroneous, of a 1971 mutual agreement subsequently and retroactively changed by defendant. *Cf. William F. Klingensmith, Inc. v. United States*, 505 F.2d 1257, 1265–66, 205 Ct.Cl. 651, 665 (1974); see also *Conrac Corp. v. United States*, 558 F.2d 994, 214 Ct.Cl. 561 (1977); *Simplex Mfg. Corp. v. United States*, 205 Ct.Cl. 858, 860 (1974); *Remler Co. v. United States*, 179 Ct.Cl. 459, cert. denied, 389 U.S. 840, 88 S.Ct. 66, 19 L.Ed.2d 102 (1967).

Assuming for present purposes that plaintiff's claim that DCAA's approval of plaintiff's method of contract cost allocation estops defendant from allocating the credit to 1968 is properly before the court, however, plaintiff's arguments and record citations fail to establish that the result plaintiff seeks is justified. While plaintiff asserts that "the system automatically and consistently gave any carryback credit to the loss year", that assertion is an unsupported one. Indeed, the record affirmatively reveals no prior "loss year" during the period 1968–70. *Litton Systems, Inc. v. United States*, 449 F.2d 392, 196 Ct.Cl. 133 (1971), cited by plaintiff in this connection, is entirely inapposite. Again, no valid basis for holding defendant estopped from allocating the credit to 1968 has been shown. *Rel-Reeves, Inc. v. United States, supra; H & M Moving, Inc. v. United States, supra.*

---

9. The said disapproval explicitly affected another listed "major cost type" contract, and implicitly affected other contracts as well.

10. While the administrative judge who handled prehearing proceedings and presided at the Board hearing did not write the administrative decision, plaintiff has failed to show that that fact is of any present significance. *Tri-Cor, Inc. v. United States*, 458 F.2d 112, 116–17, 198 Ct.Cl. 187, 194–95 (1972), and cases there cited.

Another matter related to the question of estoppel (in defendant's view, but not in plaintiff's) arises from plaintiff's contention that at the administrative hearings held in this case in June 1974, defendant's expert accounting witness from DCAA "did not express the views of DCAA * * *", and that plaintiff was thereby misled. In support of this contention, plaintiff's main brief asserts, without any support in the administrative record, that, in July 1974, DCAA took "another position on income tax allocation accounting" than had defendant's expert accounting witness before the Board a month earlier. DCAA's assertedly inconsistent July 1974 "public view", as plaintiff's main brief describes it, was "publicly stated" in response to a Financial Accounting Standards Board (FASB) inquiry. In a supplemental brief, plaintiff has attached an excerpt from a letter of July 19, 1974, from DCAA to the FASB, and urges, in substance, that DCAA's July 1974 position and its treatment of plaintiff at issue in this case are completely inconsistent.

In its response to plaintiff's supplemental brief, defendant argues that while DCAA's July 1974 position is consistent both with defendant's and DCAA's position in this case, "This estoppel issue" was not raised before the Board, and "is thus improperly before the court." Among other authorities, *Conrac Corp. v. United States, supra,* is cited in support of the proposition. In reply, plaintiff says that the July 1974 letter from DCAA is relied upon as a "strongly probative fact supporting" the position taken by plaintiff both before the Board and here, and not by way of estoppel.

Although this case was heard administratively June 17–19, 1974, it was not decided by the Board until September 23, 1975. DCAA's assertedly differing "public view" was taken in a letter dated July 19, 1974, and, according to the excerpt attached to plaintiff's supplemental brief, became a part of the FASB's "Public Record" November 1, 1974. How or when plaintiff first became cognizant of that "Public Record" does not appear. What is plain, however, is that plaintiff had abundant opportunity to bring any factual inconsistencies it now asserts to the attention of the Board prior to the September 23, 1975 administrative decision herein, or even after that decision by way of a motion for reconsideration, but failed to do so.

In the foregoing circumstances, defendant's estoppel authorities are not controlling here. In this Wunderlich Act review, however, defendant's contention that plaintiff's arguments based on an alleged DCAA change of position on income tax accounting allocation are not properly before the court is nonetheless sound. *McKee v. United States,* 500 F.2d 525, 539, 205 Ct.Cl. 303, 329 (1974); *Northbridge Electronics, Inc. v. United States,* 444 F.2d 1124, 1130, 195 Ct.Cl. 453, 463 (1971); *cf. United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

### IV

The EA–6B contract here in suit contained, among other clauses, Article 4, "Allowable Cost, Incentive Fee, and Payment (Apr. 1966) (ASPR 7–203.4(b) Rev. 17)", providing in part as follows:

(a)(1) For the performance of this contract, the Government shall pay to the Contractor—

(i) the cost thereof (hereinafter referred to as "allowable cost") determined by the Contracting Officer to be allowable in accordance with—

(A) Part 2 of Section XV of the Armed Services Procurement Regulation as in effect on the date of this contract; and

(B) the terms of this contract; * *

* * * * * *

(f) The Contractor agrees that any refunds, rebates, credits, or other amounts (including any interest thereon) accruing to or received by the Contractor or any assignee under this contract shall be paid by the Contractor to the Government to the extent that they are properly allocable to costs for which the Contractor has been reimbursed by the Government under this contract.

For purposes of the EA–6B contract, Armed Services Procurement Regulation (ASPR) Section 15–201.1, "Composition of Total Cost", a part of Section XV, defined the total cost of a contract as "the sum of the allowable direct and indirect costs allocable to the contract, incurred or to be incurred, less any allocable credits." Section 15–201.4, "Definition of Allocability", dealt with determining the circumstances in which "a cost is allocable to a Government contract * * *", and Section 15–201.5, "Credits", provided that "The applicable portion of any income, rebate, allowance, and other credit relating to any allowable cost, received by or accruing to the contractor shall be credited to the Government * * *." Sections 15–201.2 and 15–203 dealt, respectively, with "Factors Affecting Allowability of Costs" and "Indirect Costs".

Section 15–205 treated "Selected Costs". Section 15–205.41, "Taxes", contained three subsections. In pertinent part, Section 15–205.41(a) provided that, in general, taxes (including state and local income taxes) which a contractor was required to pay and which were paid or accrued in accordance with generally accepted accounting principles were, with specified exceptions allowable, and Section 15–205.41(c) provided in part as follows:

> (c) Any refund of taxes, interest, or penalties, and any payment to the contractor of interest thereon, attributable to taxes, interest, or penalties which were allowed as contract costs, shall be credited or paid to the Government in the manner directed by the Government * *.

While it is difficult to set forth in any concise form plaintiff's many assertions in support of the broad proposition that the Board erred in holding the credit to be "properly allocable" to 1968, within the meaning of Article 4(f), *supra*, the theme underlying those assertions is that, under "sound accounting logic" and generally accepted accounting principles (GAAP), the credit was "only properly allocable to 1971."

· Among other things, plaintiff asserts that there is an "accounting requirement to account for a net operating loss income tax credit as a credit to the year of the loss"; that there is an "incorporation of income tax allocation accounting within the ASPR Section XV cost principles"; that under GAAP and sound accounting the credit must be associated or "matched" with the "occurrence which gave rise to the * * * credit"; that viewing the credit as either a reduction of Grumman's 1968 franchise tax or as allocable to 1968 costs is "contrary to sound accounting logic and contrary to GAAP"; that under "the best accounting logic available and under GAAP" the credit was a reduction of 1971 costs, rather than a reduction or refund of 1968 franchise taxes; that "the best and most logical system of accounting for income taxes and income tax credits is to assign the income tax credit from losses to the loss year"; that both Internal Revenue Service rules and Securities and Exchange Commission practices support allocation of the credit to 1971; and that a "profit and loss system of state income tax allocation assigns tax credit to loss years without retroactive carryback to prior years * * *."

From the foregoing, it is readily apparent that all of plaintiff's many attacks on the Board's determination of allocability of the credit to 1968 are founded upon income tax and accounting concepts, with considerable and repeated reference to, and stress upon, "sound accounting logic" and GAAP.[11]

As defendant sees the matter, Article 4(f), *supra*, and the ASPR cost principles incorporated therein, are controlling, and require allocation of the credit to 1968. In defendant's view, the income tax and

---

**11.** Plaintiff complains that the Board noted that allocation of the credit to 1971 would result in crediting government cost reimbursement type contracts with less money than would allocation to 1968. That a particular result leads to greater governmental recovery than does another is a wholly improper basis for deciding whether or not plaintiff's position has any merit. The administrative decision here rested on other grounds, however, and, if correct under Wunderlich Act standards, is not to be reversed simply because an improper consideration was noted therein.

accounting concepts upon which plaintiff relies "to override the mandate of its contract with defendant" are irrelevant. Defendant concludes that the Board fairly and reasonably considered the evidence and the legal arguments presented by plaintiff in its "attempts to apply tax and accounting concepts to what is, in reality, no more than an elementary contract case", and that in this Wunderlich review the Board decision should be upheld.

Neither party cites, not has independent research revealed, any case (save that under review) in which the precise issue here present has been considered by the Board, nor has this court heretofore considered that question. Nonetheless, some decisional guidelines to a just result are available. After careful consideration of the record, the arguments advanced by both parties, and those guidelines, it is concluded that the result reached administratively is factually and legally correct.

Article 4(f), *supra,* and the ASPR cost principles it incorporates, have a common goal: both "are concerned with assuring that if the Government pays a cost and later that cost is reduced, by whatever means, the Government receives the benefit of that reduction. This is fair and reasonable * * *." *RMK–BRJ,* ASBCA No. 16031, 74–1 BCA ¶ 10,535 at 49,896. In *Northrop Aircraft Inc. v. United States,* 127 F.Supp. 597, 599, 130 Ct.Cl. 626, 630 (1955), this court reached essentially that same conclusion, holding that "a [cost plus a fixed fee] contract makes the Government liable only for such costs as the contractor incurs

and any reduction of a cost after reimbursement entitles the Government to a refund." See also *Northrop Corp.,* ASBCA No. 8502, 1964 BCA ¶ 4102.[12]

In an effort to avoid the force of those holdings, plaintiff contends that the Board erred in finding the credit to be a "reduction of appellant's 1968 franchise tax liability and a restitution of a portion of the * * *" New York State franchise taxes paid in 1968. That contention cannot be accepted. Plaintiff applied for and received a "Credit or Refund of Corporation Tax Paid * * * for the period ended December 31, 1968." Although that credit was obviously attributable to carryback of a net operating loss from 1971 to 1968, the credit was, both literally and plainly, a "refund" of, and a reduction in the amount of Grumman's New York State franchise tax liability for 1968. See *Allegheny Airlines, Inc. v. Civil Aeronautics Board,* 465 F.2d 778, 783 (4th Cir. 1972); [13] *Bulova Watch Co. v. United States,* 365 U.S. 753, 759, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961).

Indeed, Rev.Rul. 65–190, 1965–2 Cum. Bull. 150, upon which plaintiff relies, specifically refers to "a refund of New York State corporation franchise taxes resulting from a net operating loss carryback", and APB Opinion No. 11, also cited by plaintiff, alludes to the tax effects of any realizable loss carrybacks as giving rise to "a refund (or claim for refund) of past taxes * *." In the circumstances, the Board's conclusion that there was a refund of (and a reduction in the amount of) Grumman's 1968 fran-

**12.** In *Northrop Corp.,* the contractor incurred a California State franchise tax for its fiscal year 1956 based on its net income in fiscal 1955, and included the amount paid as a reimbursable cost in its administrative overhead pool. In 1958, a determination that the contractor had had excessive profits in 1955 was made by the Renegotiation Board. The contractor then applied for, and in 1959 received, a refund from the California State Franchise Tax Board as a result of the reduction or adjustment in the contractor's taxable income for 1955. The question was whether the refund should be treated as income of the contractor or a reduction of 1956 costs under the terms of its government cost reimbursement contracts. The Board held that the refund was a reduction of 1956 costs, and that defendant was entitled to share in the refund to the extent it had reimbursed the contractor for such costs.

**13.** See also *Hughes Air Corp. v. Civil Aeronautics Board,* 482 F.2d 143 (9th Cir. 1973); *Texas International Airlines, Inc. v. Civil Aeronautics Board,* 147 U.S.App.D.C. 363, 458 F.2d 782 (1971); *Ozark Airlines, Inc. v. Civil Aeronautics Board,* 441 F.2d 892 (8th Cir. 1971), *cert. denied,* 404 U.S. 1039, 92 S.Ct. 714, 30 L.Ed.2d 730 (1972).

chise tax costs, within the meaning of Article 4(f), *supra*, cannot be faulted.[14]

Plaintiff repeatedly stresses "sound accounting logic" and GAAP, both as demonstrating that the Board's conclusion is erroneous, and as making the credit "properly allocable" to 1971, rather than to 1968. Plaintiff's many arguments based upon such logic and principles need not be specifically discussed; while they have been carefully considered, they do not support any different result. *Northrop Aircraft, Inc. v. United States, supra; RMK–BRJ, supra; Northrop Corp., supra; Allegheny Airlines, Inc. v. Civil Aeronautics Board, supra; Bulova Watch Co. v. United States, supra;* see also *Lockheed Aircraft Corp. v. United States,* 375 F.2d 786, 792 n. 5, 179 Ct.Cl. 545, 555 n. 5 (1967); *United States Steel Corp. v. United States,* 367 F.2d 399, 409 n. 18, 177 Ct.Cl. 26, 43 n. 18 (1966).[15] Plaintiff's 1968 franchise tax costs having been reduced by a subsequent refund, defendant is contractually entitled to its proper share of that reduction computed on the basis of its 1968 reimbursement of such costs. *Ibid.*

Plaintiff's vigorous efforts fail to establish that the Board erred in holding that the credit was in fact a refund of, and a reduction in amount of, plaintiff's 1968 New York State franchise taxes, and that, under the terms of Article 4(f) and the ASPR cost principles it incorporates,[16] the refund was "properly allocable" to costs for which plaintiff had been reimbursed by defendant under the EA–6B contract. Without regard to how GAAP and sound accounting logic might treat the refund for income tax accounting purposes, the contract language controls here. See *General Dynamics Corp.,* ASBCA No. 12814, 68–2 BCA ¶ 7297, aff'd. *General Dynamics Corp. v. United States,* 202 Ct.Cl. 347 (1973).

In light of the foregoing, plaintiff's petition should be dismissed.

---

**14.** *Univac Division, Sperry Rand Corp.,* ASBCA No. 13588, 70–2 BCA ¶ 8555, extensively cited by plaintiff, is, as defendant asserts, inapposite here.

**15.** In *Lockheed,* the court noted (as it had in *United States Steel Corp.*) that " * * * one must be cautious in using 'generally accepted accounting principles' as an aid in determining the allocability of costs to government con-

tracts. Such principles have been developed for asset valuation and income measurement, and 'are not cost accounting principles' as such, although 'cost accounting concepts * * [may] evolve out of' them. * * * "

**16.** See ASPR Sections 15–201.1, 15–201.5, and 15–205.41(c), in pertinent part quoted hereinabove.