**HERCULES INCORPORATED, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 49–89 C.**

United States Claims Court.

Jan. 14, 1991.

Clarence T. Kipps, Washington, D.C., attorney of record for plaintiff. S. Maynard Turk, Charles F. Wilkinson, Wilmington, Del., and Robert K. Huffman, Washington, D.C., of counsel.

Judith Rabinowitz, with whom were Asst. Atty. Gen. Stuart M. Gerson, and Director David M. Cohen, Dept. of Justice, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

### I

Plaintiff, Hercules Incorporated ("Hercules"), is a Delaware corporation involved in the design and manufacture of a wide variety of industrial, defense and consumer products. Among plaintiff's business activities is the management of the Radford Army Ammunition Plant located in Radford, Virginia ("Radford facility"), a Government-owned contractor-operated facility which Hercules has operated under a cost-reimbursement contract with the Federal Government since 1941.

In 1987, Hercules' income for Virginia state income tax purposes included a capital gain realized from the sale of stock in a corporation engaged in the manufacture of polypropylene resins. Although this business had no connection with the Radford facility, a portion of the state income tax paid on income that included the capital gain was, nevertheless, allocated to the Radford facility. It is this allocation which has triggered this lawsuit. Three questions are presented:

First, under the regulations governing the allowability of costs of Government contracts, may Hercules claim reimbursement under the Radford management contract for a share of the company's 1987 Virginia income taxes undiminished by any amount attributable to the capital gain?

Second, assuming the income tax share is allowable, does the tax also satisfy the criteria for allocability specified in the Government's regulations?

Third, assuming allocability, does the allocation method utilized by Hercules to determine the amount of Virginia state income taxes assignable to the Radford facility satisfy the requirements of the Government's regulations?

These questions are before us on plaintiff's motion for summary judgment and defendant's opposition thereto. Based on the parties' written submissions, supplemented by oral argument, we decide the first two issues in plaintiff's favor and reserve the third for future consideration following the receipt of additional evidence.

### II

In June 1983, Hercules and Montedison S.P.A., an Italian corporation, formed a joint venture (Himont) to produce a plastics resins (polypropylene) product line. Following Himont's incorporation, Hercules and Montedison each held one half of the outstanding shares of the company.

In February 1987, shares of Himont stock were offered to the public and, as a result of this sale of common stock, both Hercules' and Montedison's ownership interests in the corporation were reduced from 50 percent to 38.7 percent. Then, in September 1987, Hercules sold its remaining shares of Himont stock to Montedison. From this last sale, Hercules realized a long-term capital gain of 1.33 billion dollars.

According to Hercules' 1987 Annual Report, the formation, as well as the later sale of Himont, were steps taken as part of a long-range corporate strategy designed to enhance the value of the company's polypropylene product line with a view to an eventual disposition.

For the tax year 1987, Hercules included the gain realized on the sale of its Himont stock with its other gains, losses, operating income, and deductions in the determination of its federal taxable income. From the resulting total (roughly 1.4 billion dollars), Hercules then calculated the amount of its total corporate income that was subject to Virginia income tax. This calculation was accomplished by use of a ratio (derived in accordance with factors prescribed by state law) which measured the percentage of the company's Virginia-based payroll, property and sales against the corporate-wide total of these factors. Through this computation, Hercules determined that 213 million dollars of corporate earnings were subject to Virginia income tax. This figure, when multiplied by the applicable tax rate, yielded a Virginia income tax liability of 12.7 million dollars. And, of this last amount, 6.9 million dollars was allocated to the Radford facility. The tax allocation to the Radford facility was accomplished by use of the same apportionment factors—payroll, property, and sales—as were used in the initial determination of the state-wide income amount. That is to say, the Radford facility was assigned a share of the total state income tax proportionate to its contribution to Hercules' total Virginia-based payroll, property, and sales.

Prior to the 1987 tax year, both Hercules and the Government had consistently recognized Hercules' Virginia state income taxes as an allowable cost under the contract providing for operation of the Radford facility, Contract DAAA 09–86–Z–003 ("Contract 003"). However, on May 31, 1988, the contracting officer informed Hercules of his intention to disallow that portion of the claimed 1987 Virginia income tax costs which he attributed to the gain realized from the Himont stock sale. The contracting officer therefore recalculated Hercules' state income tax liability to exclude an amount attributable to the Himont gain and, as a result, disallowed 5.7 million of the 6.9 million dollar tax costs which Hercules had allocated to the Radford facility.

Hercules responded to this action by submitting a certified claim to the contracting officer seeking payment under Contract 003 of the disallowed amount. On November 4, 1988, the contracting officer formally denied the claim.

The denial rested on alternative grounds. To start with, the contracting officer concluded that the portion of Hercules' Virginia state income taxes attributable to the gain realized on the sale of the Himont stock was not an allowable cost under the terms of the controlling federal procurement regulation, Federal Acquisition Regulation 31.205–41. This regulation (the pertinent text of which we come to in a moment) precludes a contractor from charging to a government contract certain types of taxes including those assessed in connection with a corporate reorganization and taxes assessed on property used solely in connection with non-Government work. The contracting officer considered each of these categories to be applicable to the tax involved here.

Alternatively, the contracting officer reasoned that, even if the taxes traceable to the Himont gain were allowable, their allocation to the Radford facility would not be permissible because that facility neither caused these taxes nor benefited from their payment.

Hercules commenced its suit in this court on January 30, 1989 seeking a judgment in the amount of the disallowed taxes—$5,722,499.

III

The Government's position in this case raises again, though now in fuller dress, the same grounds in opposition to plaintiff's claim as those on which the contracting officer had relied. Those grounds are, first, that that portion of the state income tax identifiable to the Himont gain does not qualify as an allowable cost; second, that even if allowable, the cost may not be allocated to the Radford facility, and, finally, assuming allocability, that Hercules used an improper allocation method and, as a result, placed a disproportionate share of

the tax burden on that facility. We consider each of these arguments in turn.

## ALLOWABILITY

The cost principles and procedures applicable to Government contracts are set forth in Part 31 of the Federal Acquisition Regulations, 48 C.F.R. § 31.000–31.703 (1987). Among the categories of allowable costs specifically recognized in this codification are "Federal, State and local taxes ... that are required to be and are paid or accrued in accordance with generally accepted accounting principles." 48 C.F.R. § 31.205–41(a)(1). Subparagraph (b) of this same regulation notes certain exceptions to the allowability of taxes as costs of contract performance. The Government argues that two of these exceptions apply here. The first exception concerns corporate financing and reorganizations; the second involves property taxes. They read as follows:

> (b) The following types of costs are not allowable:
>
>    ....
>
> (2) Taxes in connection with financing, refinancing, refunding operations, or reorganizations....
>
>    ....
>
>    ....
>
> (5) Taxes (including excises) on real or personal property, or on the value, use, possession or sale thereof, which is used solely in connection with work other than on Government contracts....

In arguing in favor of the applicability of the above-quoted exceptions, the Government does not dispute that state income taxes are allowable costs of contract performance. Nor does it deny that the tax amounts in issue were paid as part of the contractor's state income tax obligation. Nevertheless, it is the Government's position that characterization of a tax as one on income is not determinative of the question of allowabilty. Fulfillment of the regulation's intention, argues the Government, requires us to consider the transactions which generated the income that gave rise

to the tax. And where those transactions, if taxed individually, would precipitate a tax that the regulation deems unallowable, then taxes on the income stemming from such transactions are similarly unallowable.

Applying that reasoning here, the Government contends that the disposition of the Himont stock may be viewed either as the final step in a corporate reorganization or as a sale of property that was used solely in connection with work other than on Government contracts. In either case, since taxes associated with such transactions are not allowable, then neither should a tax on the income from such transactions be allowable. In the Government's view they are one and the same: "[t]axes in connection with" or "[t]axes ... on" a given transaction encompass taxes on the income resulting from such transactions.

◼ Although the argument is not without appeal, we do not think that the language of the regulation can support it. We start with the fact that in tax jurisprudence, the term "income" has a well understood meaning: it refers to the "gain derived from capital, from labor, or from both combined." *Commissioner v. Culbertson,* 337 U.S. 733, 740, 69 S.Ct. 1210, 1213, 93 L.Ed. 1659 (1949). Thus, a tax on corporate income does not focus on individual transactions but looks only to the *sum* of corporate activity, *i.e.,* to the existence or non-existence of a "gain." Absent a gain, there is no income; hence, no tax.

Such is not the case with the exceptions the Government relies on. A tax "in connection with" a corporate reorganization,[1] or a tax "on" the sale of property, identifies a tax whose incidence is triggered by an event rather than by any gain associated with the event. Indeed, the tax would be due even in the absence of a gain. To use plaintiff's word for it, these are "transactional" taxes, the imposition of which has nothing to do with income.

To insist on reading the exceptions to include taxes on income, as the Govern-

---

1. For purposes of this opinion it is unnecessary to examine the correctness of the Government's assertion that the sale of the Himont stock qualifies as a corporate reorganization.

ment does, not only distorts the meaning of words but also ignores the fact that where the regulation intends to disallow income taxes, it does so specifically. Exception (b)(1) for example, makes unallowable "Federal income and excess profits taxes," 48 C.F.R. § 31.205–41(b)(1), and exception (b)(7) renders unallowable certain aspects of "Income tax accruals." 48 C.F.R. § 31.205–41(b)(7). Clearly, then, the authors of the regulation understood that an income tax is a distinct type of tax—one separate and apart from a tax "in connection with" a reorganization or a tax "on" the sale of property. Accordingly, we conclude that Hercules' payment of income taxes to the State of Virginia is a cost allowable in full as a performance cost of Contract 003.

## ALLOCABILITY

We turn now to the second of the Government's principal arguments. The Government contends that even if the Virginia state income taxes paid by Hercules are allowable, no portion of these taxes may be allocated to the Radford facility. Three reasons are offered in favor of this position. The first is that the taxes attributable to the Himont gain are susceptible of direct assignment and therefore should not have been distributed among operating segments. Second is the contention that allocation to the Radford facility is inappropriate since that facility neither caused the taxes in question nor benefited from their payment. Third is the position that allocation to Radford is not permissible because

the costs were not necessary to Hercules' overall operation. We find no merit in these contentions.

The principles which govern the allocation of costs under defense contracts are referred to as the Cost Accounting Standards (CAS). These standards are set out at 4 C.F.R. §§ 400–420 (1990);[2] their use by all executive agencies and contractors is mandated by statute. *See* 41 U.S.C. § 422(f)(2) (1988).

Of importance here is Cost Accounting Standard 403 which deals with the allocation of home office expenses to segments of an organization.[3] This standard sets out the fundamental rule that, to the maximum extent practical, expenses paid by a central source (home office expenses) should be allocated among segments in accordance with the beneficial or causal relationships between the expense and the receiving segments. What this means in practical terms is that home office expenses incurred for specific segments are to be allocated directly to those segments and, where direct allocation is not possible, costs are to be grouped into logical and homogeneous expense pools and allocated on the basis of objective, measurable relationships.

The Standard also sets forth allocation methods for various groups of centrally-paid organizational expenses. Among the costs dealt with are "[c]entral payments or accruals"—a category which specifically includes "State ... income taxes." 4 C.F.R. § 403.40(b)(4). As to such costs, the Stan-

---

2. The standards also appear as part of the Federal Acquisition Regulations at 48 C.F.R. §§ 30.-400–30.420 (1989).

3. For purposes of the Cost Accounting Standards, the terms "segment" and "home office" are defined as follows:

*Segment.* One of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service. The term includes Government-owned contractor-operated (GOCO) facilities, and joint ventures and subsidiaries (domestic and foreign) in which the organization has a majority ownership. The term also includes those joint ventures and subsidiaries (domestic and foreign) in which the organization has

less than a majority of ownership, but over which it exercises control. [4 C.F.R. § 403.30(a)(4) ].

*Home Office.* An office responsible for directing or managing two or more, but not necessarily all, segments of an organization. It typically establishes policy for, and provides guidance to the segments in their operations. It usually performs management, supervisory, or administrative functions, and may also perform service functions in support of the operations of the various segments. An organization which has intermediate levels, such as groups, may have several home offices which report to a common home office. An intermediate organization may be both a segment and a home office. [4 C.F.R. § 403.30(a)(2) ].

dard provides that where payments or accruals cannot be identified with individual segments, they are to be allocated to segments "using an allocation base representative of the factors on which the total payment is based."

■ Hercules followed this approach; that is, it allocated Virginia state income taxes to Radford using the same base by which the State of Virginia's share of total corporate income was initially computed. The Government says this was wrong.

As previously indicated, the Government's contention is that the taxes were susceptible of direct allocation and therefore assignment by means of an allocation base was incorrect. In developing its argument on this point, the Government makes a number of assertions, the central theme of which is that allocation to segments is inappropriate where the circumstances disclose, as they allegedly do here, a direct relationship between the cost to be assigned (the taxes) and the source of the gain (the Himont stock sale). Says the Government: "Any beneficial or equitable relationship between the disputed taxes and Government segments is overshadowed by the direct relationship between these taxes and the Himont stock sale. As such, the increased state income taxes attributable to the Himont stock sale are unallocable." Thus, in the Government's view, it is the "windfall" (the Government's term for the capital gain) that "logically should bear the full burden of the increased state income taxes."

The argument offers no solution to the problem at hand. One of the principal objectives of a cost accounting system is to identify the costs of a business's activities and to distribute those costs among consuming components ("cost objectives")[4] in a manner that reasonably measures their demand on corporate resources. The aim is to be able to identify the "cost" of "something."

The Government's contention misses this point. To relate the tax to the gain, as the Government proposes, accomplishes nothing more than the matching of an item of income with a related expense; it is a pairing that leaves the cost unassigned. The question that should have been addressed is to what business component the tax burden ought to have been assigned if, as the Government maintains, it was wrong to have assigned it, even in part, to the Radford facility. To not answer this question is to present an analytically deficient argument.

The next point the Government argues is that allocation to the Radford facility was inappropriate since there was no beneficial or causal relationship between the tax and the facility. As before, our difficulty with the argument goes to fundamentals. Recognizing that the tax which Hercules was obliged to pay to the State of Virginia was determined in the first instance on the basis of factors that *included* Radford in the measurement of Hercules' presence in the jurisdiction, it is hard to understand how Radford could not be said to have caused the share of the tax later allocated to it.

Indeed, in the view of the Cost Accounting Standards Board,[5] allocation of state income taxes on the same basis used to compute the jurisdiction's share of total corporate taxable income fully satisfies the concept of allocating home office expenses

---

4. Accountants use the term "cost objective" to identify the activity, transaction or purpose for which a cost is incurred. The Cost Accounting Standards provide this definition:

> *Cost objective.* A function, organizational subdivision, contract or other work unit for which cost data are desired and for which provision is made to accumulate and measure the cost of processes, products, jobs, capitalized projects, etc. [4 C.F.R. § 400.1(a)].

5. The Cost Accounting Standards Board referred to in the text was an agency of the Congress established in 1970 to promulgate uniform cost accounting standards for negotiated defense contracts and subcontracts. Pub.L. No. 91–379, 84 Stat. 796 (formerly codified at 50 U.S.C. § 2168 (1982)), *repealed by* Pub.L. No. 100–679, § 5(b), 102 Stat. 4055, 4063 (Nov. 17, 1988). This original board came to an end on September 30, 1980. A new, independent Cost Accounting Standards Board, chaired by the Administrator of the Office of Federal Procurement Policy, was created in 1988. Pub.L. No. 100–679, § 5(a), 102 Stat. 4055, 4059 (Nov. 17, 1988), (codified at 41 U.S.C. § 422 (1988)).

on the basis of a beneficial or causal relationship. The Board's views on the matter are set out in the Preamble to the original publication of CAS 403. We quote in part from that document:

> [A]llocation of this expense [state and local income taxes] on the same basis used to compute a segment's share of total corporate taxable income is, in the Board's judgment, more in accord [than other allocation methods] with the concept of allocating home office expenses on the basis of the beneficial or causal relationships between such expenses and receiving segments.

The Preamble continues:

> The Board has therefore revised the illustration ... [a reference to its original proposal to allocate state and local income taxes on the basis of the profit and loss of each segment] to permit "any base or method which results in an allocation that equals or approximates a segment's proportionate share of the tax imposed by the jurisdiction in which the segment does business, as measured by the same factors used to determine taxable income for that jurisdiction." [Preamble A, paragraph (7) to CAS 403 appearing in the appendix following 4 C.F.R. § 403.80].

In light of the above-quoted text, no more need be said about the Government's position that the Radford facility lacked any causal nexus to the share of state income taxes attributed to it.

The final point which the Government makes against allocability is the contention that the tax was not a "necessary" expense to Hercules. A "necessary" expense, as the Government uses that term here, is an expense incurred in the pursuit of Hercules' business—an "essential and unavoidable" cost is the way the Government puts it. The contention is that the expense growing out of the Himont gain could have been avoided had Hercules, Inc., the parent company, placed ownership of the Himont stock in one of its wholly-owned subsidiaries rather than retaining direct control. In that situation, argues the Government, the burden of the tax would have been borne by the subsidiary rather than Hercules and its operating divisions. According to the Government, since Hercules had this option, the tax was not a necessary expense.

This argument does not deserve serious consideration. It should go almost without saying that Hercules has no obligation to shuffle assets for the sake of minimizing the Government's contract costs. Absent an intention to deliberately saddle the Government with extra contract costs—a most unlikely possibility here given that Hercules' ownership of Himont dates to a time that gain from the sale of that asset could have been no more than a hope—the Government must take its contractors as it finds them. And if the Government's aim is to avoid certain types of contract costs then the remedy lies in regulation. The tax costs in question were incurred by Hercules in the overall conduct of its business; hence they are allocable.

## ALLOCATION METHOD

We come now to the last of the Government's principal arguments. The contention is that even if the issue of allocability is resolved in Hercules' favor, the company's method of determining the specific amount of tax assignable to Radford is not acceptable because that method violates certain basic allocation precepts.

The first deficiency which the Government sees in Hercules' allocation method is the failure to include income as a factor in the allocation base. To recall, Hercules determines the amount of tax allocable to Radford through a two-step process. The first step involves the determination of the amount of the company's total income that is taxable in Virginia. That identification is accomplished by applying to Hercules' state-adjusted federal taxable income a percentage that reflects the average of the ratios of Hercules' property, payroll and sales in Virginia to the company's total property, payroll and sales. To the income identified by this apportionment formula, Hercules then applies the applicable state tax rate—a calculation which yields the total amount of Virginia income tax payable.

The second step involves ascertainment of the amount of the state income tax that is to be allocated to Radford. This is accomplished through use of the same factors by which the amount of Virginia-based income is determined in the first instance. That is, there is applied to the total taxable amount a percentage that reflects the average of the ratios of Radford's property, payroll and sales to the company's total Virginia-based property, payroll and sales.

It is with this second step that the Government finds fault. Specifically, the Government's complaint is that the allocation method is defective because it fails to include income in the base. In other words, in addition to property, payroll and sales, the allocation formula should also have measured the ratio of Radford's income to total Virginia-based income. Without that ratio being included in the allocation—the Government maintains—the tax cannot be correctly allocated. As support for this position the Government relies on the Federal Circuit's affirmance of the Armed Services Board of Contract Appeal's decision upholding the Lockheed Corporation's use of an income-inclusive allocation base to distribute state franchise taxes.

The case relied on, *United States v. Lockheed Corp.*, 817 F.2d 1565 (Fed.Cir. 1987), *aff'g, Lockheed Corporation* and *Lockheed Missiles & Space Company, Inc.*, ASBCA No. 27921, 86-1 B.C.A. (CCH) ¶ 18,614, 1985 WL 17284 does not support the Government's argument.

Contrary to the reasoning now attributed to it, the court of appeals did not say that income was a *required* element of the allocation base. What it said was that income "can" be included. Here are the court's words in full:

> We hold that in order for Lockheed's California Franchise Tax to "be allocated to benefited segments using an allocation base representative of the factors on which the total payment is based" [as required by CAS 403] both causal factors, [*i.e.*] the segment's net income, and the contribution by the segment to the apportionment factors, can be includ-

ed in an appropriate manner. [817 F.2d at 1572].

Clearly, the Government has overread the board's decision.

Nor should it be assumed that the Federal Circuit did not mean exactly what it said. The quoted text is virtually identical to language appearing in the board's decision with a single exception. Where the board had said income "must be included," 86-1 BCA at 93,539, the court said "can be included." 817 F.2d at 1572. This is not a change in emphasis; it is a change in holding. For our purposes it means that Hercules is in full compliance with CAS 403 and controlling case law where the factors it uses to determine the amount of tax assessed by Virginia are also used to allocate that tax to segments within Virginia.

The next deficiency which the Government attributes to Hercules' allocation method is a claimed failure to have grouped home office expenses (which include the state income tax paid on the Himont gain) into "logical and homogeneous expense pools"—a basic requirement for indirect allocation specified by CAS 403.40(a)(1).

Specifically, the complaint is that the pool of state income taxes used by Hercules to allocate state income taxes to Radford is not homogeneous because it includes income taxes on capital gains as well as income taxes on operating income. The Government argues that in order to achieve the required homogeneity, the single pool must be segregated into two separate pools—one for taxes attributable to capital gain; the other for taxes attributable to operating income—with each pool to be allocated by means of an allocation base representative of the factors that caused the taxes.

The argument has little merit. Assuming for the sake of discussion that the taxes should have been grouped into two separate expense pools, we fail to see how that would achieve an allocation different from what was done. The fact is, it would not. Separation into pools accomplishes nothing unless the basis for allocation also is changed. There is, however, no justifica-

tion for such a change: the same factors which determine Virginia's share of Hercules' operating income also determine the state's share of Hercules' extraordinary income. Therefore, since the allocation base remains the same even when the costs are assigned to° different pools, it cannot be argued that the costs are improperly grouped in a single pool. *See* 4 C.F.R. § 418.50(b)(1).[6]

This then brings us to the final deficiency which the Government sees in Hercules' allocation method. Again, some background is necessary. After Hercules has determined the amount of Virginia income tax that is allocable to Radford (the amount comes to about 55 percent of the total state income tax obligation) the balance of the tax is placed in a pool (along with other state income taxes) which is then allocated among all corporate segments, excluding, however, the Radford facility. It is this two-fold allocation scheme which the Government says is wrong.

The criticism is that this method of allocation demonstrates a lack of consistency and thus violates one of the fundamental tenets of a sound accounting system: that costs incurred for a similar purpose be allocated similarly.

In support of this position, the Government cites CAS 403.40(a)(2) which declares that "[n]o segment shall have allocated to it as an indirect cost, either through a homogeneous expense pool, or the residual expense pool, any cost, if other costs incurred for the same purpose have been allocated directly to that or any other segment." 4 C.F.R. § 403.40(a)(2). Although we are not here dealing with a prohibited admixture of direct and indirect allocations from the same category of costs, nevertheless the Government sees the regulation as illustrative of its basic point: that costs incurred for the same purpose and drawn from the same expense pool are to be allocated among final cost objectives on the same basis.

Plaintiff answers the criticism by saying that the only issue before the court concerns the amount of state tax properly chargeable to Radford. Therefore, so long as the method by which that amount was determined is seen to be in compliance with the Cost Account Standards, then it cannot matter—at least for purposes of this lawsuit—whether the balance of the state income tax should have been allocated differently. According to plaintiff, then, the only point of concern is whether Radford has borne more than its proper share of the tax. And the answer to that question, says plaintiff, is no.

This is not an easy issue for the court to decide; both sides present a persuasive argument. Validation of the Government's argument may be seen in Preamble A to CAS 403. That preamble, it will be recalled, deals with the basis for allocation of state income taxes; it sets out the basic rationale that the tax should be allocated among segments in a jurisdiction in accordance with the same factors that were used to determine the total amount of the tax for that jurisdiction. The preamble also says—and this is the point we consider important here—"[a]s a practical matter, this means that the tax for any State must be allocated only to those segments that contribute to the factors used to measure taxable income for that State." In other words, the taxes of any particular jurisdiction are to be allocated only to those segments that do business in the taxing jurisdiction.

Hercules does not allocate all of its Virginia tax to the segments in Virginia; hence, it is not in full compliance with CAS 403. But is this nevertheless an irrelevant infraction because, as Hercules alleges, it occasions the Government no injury?

We cannot assume, as Hercules would have us do, that the answer is no simply because Radford is seen to bear its proportionate share of Virginia income taxes as

---

6. CAS 418, which deals with the allocation of direct and indirect costs, recognizes an indirect cost pool to be homogeneous "if the allocation of the costs of the activities included in the cost pool result in an allocation to cost objectives

which is not materially different from the allocation that would result if the costs of the activities were allocated separately." [4 C.F.R. § 418.50(b)(1)].

determined through a property-payroll-sales allocation scheme applied on a state-wide basis. The real issue is whether Radford's share remains a fair share when tested in light of the allocation scheme by which the balance of Hercules' state income taxes (including Virginia) are distributed among the company's other segments.[7] The issue cannot be answered on the basis of the record now before the court. Final disposition of the case will require additional evidence.

## IV

For the reasons stated in this opinion, we grant plaintiff's motion for summary judgment with respect to the issues of allowability and allocability, but deny the motion insofar as it seeks approval of Hercules' method of allocation.

---

**7.** Defendant states in its brief that, in the allocation of the pooled state income taxes, a portion is assigned to a second Hercules-managed, Government-owned facility located in Sunflower, Kansas. Assuming this statement reflects an accurate understanding of Hercules' allocation scheme, then it would appear that the Government is indeed shouldering a disproportionate share of Virginia income taxes. We cite this situation now only as an example and, of course, intend no binding conclusion with respect to it.