**HERCULES INCORPORATED, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 49–89 C.**

United States Claims Court.

Aug. 17, 1992.

Clarence T. Kipps, Washington, D.C., attorney of record for plaintiff. Michael B. Keehan, Timothy Kavanaugh, Wilmington, Delaware, and Robert K. Huffman, Washington, D.C., of counsel.

Judith Rabinowitz, with whom were Asst. Atty. Gen. Stuart M. Gerson, and Director David M. Cohen, Dept. of Justice, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

In an earlier phase of this lawsuit, the court ruled that income taxes paid to the State of Virginia on gain realized from the sale of a corporate asset qualified as reimbursable costs under plaintiff's contract for the management and operation of a Government-owned munitions facility located in that state. Although we held these taxes to be both allowable and allocable to

the contract in issue, we nevertheless went on to deny plaintiff's motion for summary judgment because the case raised other issues not answerable on the basis of the existing record. *Hercules, Inc. v. United States*, 22 Cl.Ct. 301 (1991). Further briefing was directed.

The case is once again before us on plaintiff's renewed motion for summary judgment and defendant's opposition thereto. Oral argument in this second round of the lawsuit was heard January 14, 1992; subsequently, at the parties' request, the court suspended proceedings to allow settlement negotiations to be undertaken. Unfortunately, those negotiations did not resolve all issues. Accordingly, we now lift the suspension and go on to decide the remainder of the case.

I

The pertinent factual and legal background of this suit is set forth in the court's earlier opinion. For the sake of convenience, we restate part of that background here.

Hercules is a multi-state corporation whose business activities include the operation of a Government-owned munitions plant for the United States Army. This plant, located in Radford, Virginia, has been managed by Hercules under a cost-reimbursement contract with the Federal Government since 1941. In 1987, Hercules' income for Virginia state income tax purposes included a long-term capital gain which the company had realized from the sale of its investment in a polypropylene resin manufacturing facility (the "Himont stock sale"). That facility bore no functional connection to the Government-owned Radford munitions plant.

In the prior phase of this lawsuit, the court was asked to determine whether regulations governing the allowability of costs under Government contracts permitted Hercules to assign to the Radford contract a share of the company's Virginia income

tax undiminished by the amount of tax attributable to the Himont stock sale. The question, in other words, was whether Radford could be required to bear its respective share of the state's income tax without regard to the nature of the corporate activity that generated the income upon which the tax was imposed. We concluded that the income tax which Hercules paid to the State of Virginia on the extraordinary gain realized from the Himont stock sale was allowable, in full, as a *performance cost* under the Radford contract. 22 Cl.Ct. at 305.

The question that was left for later decision concerned the amount of the state income tax that Hercules assigned to the Radford facility. More particularly, the question has to do with the dual allocation method that Hercules uses in determining costs chargeable to Government contracts. As explained in the earlier opinion, state income taxes chargeable to Radford are determined by a direct identification method, that is, the allocation is accomplished through use of the same formula by which the amount of Virginia-based income is determined in the first instance. The result is that Radford's share of state income taxes is directly proportionate to its contribution to the amount of total corporate income identifiable to Virginia.

As to the balance of the Virginia income tax, this is placed in a pool (along with other state income taxes) that is then allocated among all corporate segments, including those performing other Government contracts.[1] In effect then, Hercules accounts for costs assignable to Government contracts through a hybrid allocation scheme—the Radford contract receives what is essentially a direct allocation while all other contracts have their shares determined by a surrogate method.

The difficulties with this allocation methodology—and the reason the court initially withheld the granting of summary judgment to plaintiff—are two-fold. The imme-

---

1. Hercules operates one other Government-owned facility, the Sunflower Army Ammunition Plant in Sunflower, Kansas. Sunflower is treated, for tax allocation purposes, the same as Radford and thus Kansas income tax attributable to Sunflower is also not included in the national tax pool.

diate problem had to do with assuring the fairness of the amount allocated to Radford. Given Hercules' dual allocation methodology, the question that needed to be answered was whether the direct allocation method actually permitted a larger percentage of state income tax costs to be accumulated against the Radford contract than would be the case if Hercules adhered to a single allocation method, *i.e.*, the pooling method. The question, in other words, was whether these side-by-side allocation schemes, when examined on a corporate-wide basis, masked a disproportionate allocation of costs to Radford.

The second and more fundamental problem associated with plaintiff's allocation methodology concerns its hybrid character: costs are assigned to government contracts using two different allocation schemes. Even if such an approach were shown not to involve discriminatory cost shifting, the question that remained was whether this dual allocation scheme was compatible with the standards governing the allocation of costs to government contracts—the Cost Accounting Standards (CAS).[2]

The parties have been given the opportunity to address these issues both in writing and in oral argument. Based on this exchange of views, we now note the following.

## II

Addressing first of all the fairness of the tax costs allocated to Radford, on this issue the parties have reached an agreement. That is to say, both find facially acceptable an allocation to Radford (using the direct allocation method) that results in a contract cost of $4,870,446. What the parties' agreement does not resolve, however, is the larger issue presented here, namely, the legitimacy of Hercules' continued use of a dual allocation method.

On this issue, Hercules argues, first of all, that it is moot, given the parties' agree-

ment on the amount of state income taxes allocable to Radford. Hercules would therefore have us leave a decision on this issue for another day. But—the argument continues—even if we do go on to address the issue now, the outcome would have to be in Hercules' favor.

Focusing on the merits of the problem, Hercules' contention is that the Cost Accounting Standards do not prohibit the simultaneous use of a direct or representative method to allocate the income taxes of one state and a surrogate method (such as the pooling method) to allocate the income taxes of other states. All that is required, maintains Hercules, is that the allocation methodology ensure that the taxes of a particular jurisdiction be allocated only to segments doing business in the taxing jurisdiction.

The Government answers both parts of Hercules' position with the same argument. From its point of view, adherence to a hybrid allocation scheme in the assignment of costs to Government contracts violates a fundamental tenent of the Cost Accounting Standards, namely, that costs incurred for similar purposes be allocated similarly. And since those Standards are uniformly applicable to all of Hercules' contracts with the Government—the argument continues—Hercules cannot maintain that it has fully complied with the requirements of the Radford contract while simultaneously insisting on a right to a different allocation scheme under other Government contracts. The Government urges us to endorse these views and to go on to declare that compliance with the Cost Accounting Standards demands adherence to the direct allocation method.

■ Speaking first to the mootness issue, we agree with the Government that this case would be left in an incomplete state of resolution were we to accept the contention that agreement on the amount

---

**2.** As explained in the court's earlier opinion, the principles governing the allocation of costs under defense contracts are referred to as the Cost Accounting Standards (CAS). These standards are set out at 4 C.F.R. §§ 400–420 (1990); they also appear as part of the Federal Acquisition

Regulations at 48 C.F.R. §§ 30.400–30.420 (1989). Use of the Cost Accounting Standards by all executives agencies and contractors is mandated by statute. *See* 41 U.S.C. § 422(f)(2) (1988).

allocable to Radford resolves all the issues that that allocation question presents.

Contrary to Hercules' view of it, the issue before us now is not one bounded by a single contract. Instead, we are concerned with a contract question whose ramifications reach beyond the present context and involve all of Hercules' contracts with the Government. The question, in a nutshell, is whether Hercules satisfies its obligation under the contractually-mandatory Cost Accounting Standards when it adheres to an accounting practice that charges state income taxes to Government-owned, contractor-operated (GOCO) facilities by one scheme of allocation and relies on a different scheme of allocation for non-GOCO contracts. An answer to this question is as vital to the Radford contract as it is to any of Hercules' other contracts with the Government. The issue is appropriate for decision now.

■ The Cost Accounting Standards, as Hercules correctly points out, do not specifically address a contractor's simultaneous use of different bases or methods for the allocation of state income taxes to corporate segments operating in different taxing jurisdictions. Nevertheless, we do not accept Hercules' contention that this silence affirms the legitimacy of such a bifurcated approach to cost allocation.

The aim of any cost accounting system is to catalog costs in a manner that will promote accuracy, uniformity and comparability in the measurement of resource consumption. To achieve this goal, consistency in the application of accounting practices is essential. Indeed, for cost accounting under Government contracts, Congress has so mandated: "The [Cost Accounting Standards] Board shall have the exclusive authority to ... promulgate ... standards ... designed to achieve uniformity and consistency in the cost accounting standards governing ... allocation of costs to contracts with the United States." 41 U.S.C. § 422(f)(1) (1988).

Hercules cannot satisfy this goal where the accounting practice that it follows in the allocation of state income taxes to government contracts, first of all, fails to allocate all Virginia taxes by the same allocation method and, secondly, allocates other state taxes (along with the unallocated remainder of Virginia state taxes) by a different allocation method. Such a system is bound to invite doubt about the objectivity and accuracy of the numbers it reports. Indeed, it is a system that leads to the sort of questions that precipitated the continuation of this lawsuit.

The Cost Accounting Standards set out as a fundamental requirement the rule that costs incurred for a similar purpose are to be allocated similarly. ("The criteria for determining the allocation of costs to a product, contract, or other cost objective should be the same for all similar objectives." 4 C.F.R. § 402.20). What this means, when applied to the allocation of state income taxes, is that the Government is entitled to charges determined by a single allocation scheme—one that allocates to each segment doing business within a particular jurisdiction its respective share of the total tax imposed by that jurisdiction.

Hercules' dual allocation scheme for the assignment of state income taxes fails the test of consistency and is therefore out-of-line with the Cost Accounting Standards.

■ The other point that we need to address concerns the Government's argument that, under the Cost Accounting Standards, state income taxes must be allocated by the direct allocation method rather than by the pooling method. Here we part company with the Government.

Cost Accounting Standard 403, 4 C.F.R. § 403.40, deals with the allocation of home office expenses including such centrally paid expenses as state and local income taxes. This Standard points out that where such payments or accruals cannot be identified specifically with individual segments, they are to be allocated to benefited segments "using an allocation base representative of the factors on which the total payment is based." 4 C.F.R. § 403.40(b)(4).

In a preamble issued by the Cost Accounting Standards Board in conjunction with its original publication of CAS 403, the Board explained that the basis for this rule

is a recognition that state income taxes are akin to other home office expenses and therefore their allocation should be guided by the same concept. That is, allocation should proceed on the basis of the beneficial or causal relationship between the expense and the receiving or originating segment. 4 C.F.R. Part 403, Preamble A, ¶ 7. And this concept, the Board went on to say, permits the use of "any base or method which results in an allocation that equals or approximates a segment's proportionate share of the tax imposed by the jurisdiction in which the segment does business, as measured by the same factors used to determine taxable income for that jurisdiction." *Id.*

Given the text of CAS 403 and its accompanying explanation, the court cannot say that allocation of state income taxes from a pool is inconsistent with the dictates of CAS 403. The Board has made clear that a contractor may use "any base or method" of allocation provided, of course, it satisfies the fundamental concern of assigning to each segment operating within a taxing jurisdiction that segment's contributory share of the total tax determined for the jurisdiction. In short, if Hercules' method for allocating its pooled state income taxes reasonably approximates the allocation to segments that a direct allocation method would achieve, then that method satisfies Government cost accounting standards.

### III

Based on the parties' stipulation, the Clerk is directed to enter judgment in Hercules' favor in the amount of $4,870,446 together with interest at the rate specified by law, measured from July 26, 1988, the date of submission of its certified claim to the contracting officer.

The court's opinion of January 14, 1991, as supplemented by the present opinion, shall stand as the law of the case. Plaintiff's motion for summary judgment is allowed to the extent noted in these opinions.