**HERCULES INCORPORATED, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–127C.**

United States Court of Federal Claims.

March 28, 2001.

Robert K. Huffman, Washington, DC, for plaintiff. Lisanne E.S. Cottington, Washington, DC, of counsel.

Franklin E. White, Jr., Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant, with whom were Robert E. Kirschman, Jr., Assistant Director; David M. Cohen, Director; David W. Ogden, Assistant Attorney General. Wayne J. Bober, Defense Contract Management Command, of counsel.

## OPINION

DAMICH, Judge.

This matter is before the Court on cross-motions for summary judgment. The parties also filed two sets of supplemental briefs. This case arises under the Contract Disputes Act of 1978, 41 U.S.C. § 609 (1994) ("CDA") and the Tucker Act, 28 U.S.C. § 1491 (1994). At issue in this case is whether the Plaintiff is required to pay the Defendant $3,845,000 that the Defendant claims to be its proportionate share of a $10,500,000 tax refund that Hercules received from the Commonwealth of Virginia in 1995 in connection with a 1987 Virginia state income tax liability, which was previously reimbursed by the Defendant pursuant to a contract. The Defendant claims that the Plaintiff must calculate the Defendant's share of the refund in accordance with the "apportionment factors" of Virginia that the Plaintiff used in calculating the allocation based on the income tax cost in 1987, the year in which the tax cost was incurred. The Plaintiff claims that it is entitled to calculate the Defendant's share of the refund in accordance with the "apportionment factors" of Virginia that the Plaintiff used in calculating the allocation base of the tax refund in 1995, the year in which the tax refund was received by the Plaintiff. For the reasons enumerated below, the Court GRANTS the Defendant's motion for summary judgment in part and DENIES the Plaintiff's motion for summary judgment.

## I. Facts

### A. Relevant Contractual Provisions

The Plaintiff, through a division called the Hercules Aerospace Company, sold supplies and services to the United States Department of Defense.[1] This division operated a number of facilities in several states. One of these facilities was the Radford Army Ammunition Plant, a government-owned contractor-operated ("GOCO") facility, which it had operated since 1941 under a series of cost-reimbursement contracts. The Radford plant produced ammunition and other products for the United States Army. These contracts entitled the Plaintiff to be reimbursed

1. Hercules Aerospace Company was sold to Alli- ant Techsystems, Inc., on March 15, 1995.

by the Army for allowable costs that were allocable to the contracts, including state income and franchise taxes. As of January 1, 1995, the Plaintiff began operating the Radford plant as a firm fixed-price contract. The specific contract at issue is entitled "Contract No. DAAA09–86–Z–003" between the Defense Contract Management Command and the Plaintiff.

The contract includes a clause entitled "ALLOWABLE COST AND PAYMENT (52.216–7 Apr. 1984)," which provides the manner in which costs are to be reimbursed to a contractor by the Government. The clause states, in relevant part:

> (h)(2) The Contractor shall pay to the Government any refunds, rebates, credits, or other amounts (including interest, if any) accruing to or received by the Contractor or any assignee under this contract, to the extent that those amounts are properly allocable to costs for which the Contractor has been reimbursed by the government. Reasonable expenses incurred by the contractor for securing refunds, rebates, credits, or other amounts shall be allowable costs if approved by the Contracting Officer.

48 C.F.R. § 52.216–7(h)(2).

The contract also incorporates the "TAXES" provision of the Federal Acquisition Regulations (FAR), which states, in relevant part:

> (d) Any taxes, interest, or penalties that were allowed as contract costs and are refunded to the contractor shall be credited or paid to the Government in the manner it directs.

\*\*\*

> However, any interest actually paid or credited to a contractor incident to a refund of tax, interest, or penalty shall be paid or credited to the Government only to the extent that such interest accrued over the period during which the contractor had been reimbursed by the Government for the taxes, interest, or penalties.

48 C.F.R. § 31.205–41. The contract also incorporates the "CREDITS" provision of the FAR, which states, in relevant part:

> The applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund.

48 C.F.R. § 31.201–5.

B. The Plaintiff's Allocation of Tax Costs to the Radford Plant

The Plaintiff pursued a hybrid allocation methodology in determining how the costs would be charged to government contracts. When the Plaintiff sought reimbursement of its Virginia state income tax costs pursuant to its operation of the Radford plant, it allocated Virginia tax costs to the Radford plant based on the *ratio* of the Radford plant's property, payroll and sales in Virginia for the year to the Plaintiff's total property, payroll, and sales in Virginia for the year. *See Hercules, Inc. v. United States*, 22 Cl.Ct. 301 (1991) (Wiese J.). Property, payroll, and sales are the factors that the State of Virginia uses to "apportion" a corporation's income to Virginia for tax purposes. Thus, these factors are called the "Virginia apportionment factors." When the Plaintiff incurred the Virginia state income tax cost at issue in this case, the Plaintiff allocated that cost to the Radford plant based upon the ratio of the apportionment factors that existed for that year, which was 1987. These apportionment factors were then applied to what the parties call the 1987 "contract mix" which is based on the mix of firm fixed-price contracts and flexibly priced contracts performed at the Radford plant in 1987. The end result is what will be called, for simplicity's sake, the "Virginia apportionment factors" for 1987.[2] This particular method is a *direct cost allocation method*. With respect to other segments of the Hercules Aerospace Company, however, it used a *pool method,* or a *surrogate method,* to allocate state income

---

2. The same process is used to determine what will be called the "1995 Virginia apportionment factors" except that the apportionment factors of property, payroll, and sales of 1995 and the contract mix of 1995 are used.

and franchise tax costs.[3] (The Plaintiff also had a GOCO plant in Sunflower, Kansas, but the tax costs from the Sunflower plant were not allocated to the "pool.") Under this "pool method," the state income and franchise costs remaining after deduction of the Virginia income tax costs allocated to the Radford plant and the Kansas state tax costs allocated to the Sunflower plant were allocated to the remaining segments based on the ratio of each segment's property, payroll, and sales nationwide to the Plaintiff's total property, payroll, and sales nationwide.

### C. The 1987 Himont, Inc., Capital Gains Dispute and the Prior Claims Court Action (*Hercules I*)

In September 1987, the Plaintiff sold its stock in Himont, Inc., a wholly commercial manufacturer of polypropylene resins, for approximately $1.3 billion. The Plaintiff calculated the Government's portion of its Virginia tax liability, which included the capital gains taxes from the sale of Himont at $6.90 million. However, on May 31, 1988, the contracting officer informed the Plaintiff that he intended to disallow the increase in state income and franchise tax cost resulting from the gain realized in the Himont stock. On July 26, 1988, the Plaintiff submitted a certified claim in which it demanded payment of the disallowed amount. On November 4, 1988, the contracting officer formally denied the Plaintiff's claim.

On January 30, 1989, the Plaintiff filed a complaint before the United States Claims Court seeking a judgment for the amount of the disallowed taxes. This Claims Court proceeding will be called *Hercules I*. The issues before the Court in *Hercules I* were whether the income tax paid by Hercules to Virginia upon the gain realized from the sale of wholly commercial assets was an allowable cost allocable to the contract and, if so, whether the Plaintiff's method of allocation complied with the Cost Accounting Standards ("CAS"). On January 14, 1991, the Court held that the Plaintiff's payment of income taxes to Virginia was a cost that was allowable in full as a performance cost of the contract. *Hercules, Inc.*, 22 Cl.Ct. at 305. The Court also held

that the tax was allocable to the Radford plant. *Id.* at 307. However, the Court could not determine whether the Plaintiff's hybrid method of allocating Virginia state income tax to the Radford plant in accordance with the ratio of "apportionment factors" and allocating tax costs from other segments under a "pool" or "surrogate" method as stated above was proper because the hybrid allocation method was arguably not in full compliance with the CAS. *Id.* at 310.

On January 14, 1992, oral argument was held on the issue of whether the Plaintiff's allocation scheme was proper. At oral argument, Judge Wiese indicated that he would rule in favor of the Plaintiff. However, he attempted to broker an arrangement between the parties so that each party's vital interest in the litigation was protected. The arrangement that Judge Wiese brokered was the following: the Plaintiff could maintain its hybrid method of allocating taxes by a direct allocation method for those costs incurred at the Radford, Virginia, and Sunflower, Kansas, plants and a surrogate or pool allocation method for all other plants provided that the pool method reasonably approximated the allocation of costs that would have resulted if the Plaintiff utilized a direct allocation method instead. In return, the Plaintiff would have to change how it allocated its state income taxes from 1992 forward provided that the parties would be able settle on the amount of taxes owed to the Plaintiff. (Tr. at 40, 46, 54, 69). Judge Wiese then asked the Defendant's attorney-of-record, Judith Rabinowitz, whether the Government intended to appeal his ruling once final judgment was entered. The dialogue between Judge Wiese and Ms. Rabinowitz went as follows:

> THE COURT: Ms. Rabinowitz, is it your intention to appeal—once final judgment is entered ... [D]o you think that the Court's ruling on the allowability issue was wrong? And if it were appealable, would you appeal it?
>
> MS. RABINOWITZ: I'd have to honestly say that it would be under consideration. However, certainly were the Judge to rule

---

3. The pool method of allocation is not directly at issue in this case.

along the lines that the Court has indicated today, we would not appeal.

(Tr. at 71.)

Subsequently, the parties stipulated to an allocation of the Plaintiff's Virginia state income tax that resulted in a reimbursable cost of $4,870,466. Accordingly, on August 17, 1992, the Court entered a judgment in the amount of $4,870,466 plus CDA interest from July 26, 1998. *Hercules, Inc. v. United States*, 26 Cl.Ct. 662 (1992). The Plaintiff was paid $4,870,446 in damages and $1,803,362 for the payment of interest. It also incurred $485,457.79 in legal fees and related expenses to obtain the judgment. The Plaintiff was not awarded these fees at the conclusion of *Hercules I.*

### D. Communications Between the Parties Subsequent to Final Judgment

During the period of time when the Defendant had the right to appeal the final judgment entered in *Hercules I*, Ms. Rabinowitz inquired of the Plaintiff's lead counsel, Mr. Clarence Kipps, whether it intended to seek a refund of Virginia state income tax payments resulting from the sale of the Himont stock and whether the Government would receive its share of any refund that the Plaintiff might receive from Virginia. (Pl.'s Ex. 92 at G 200000.) Mr. Kipps replied to her in a letter dated October 9, 1992, stating that it "intend[ed] to vigorously pursue the claim." *Id.* at G 200001. Attached to Mr. Kipps' letter was a letter from David M. Cardillo, the Plaintiff's Government liaison, dated October 8, 1992, which indicated how the Plaintiff would allocate the refund. This letter states, in relevant part:

> You have asked how Hercules would account for a refund if one was received from the State of Virginia for the 1987 state income tax payment. More specifically, how the refund would be priced on the Radford # 0003 Contract, and on the non-GOCO contracts at other Hercules locations.
>
> As you know, we have a two-step allocation procedure, which first determines the allocable amount to the GOCO locations (Radford and Sunflower). If a refund is received from the State of Virginia, the

Radford contract would be given credit for an amount of the refund in the same proportion or percentage as the 1987 charge. *Id.* at G 200002.

The Defendant elected not to appeal the August 1992 judgment of the Claims Court. Mr. David Cohen, the Director of the Commercial Litigation Branch of the Department of Justice ("DOJ") testified that he made the decision not to appeal the August 1992 judgment. (September 10, 1999, Cohen Decl. at ¶ 3.) However, he did not recall the decision itself or the factors upon which it was based, did not recall seeing the October 1992 letter from the Plaintiff, and did not recall any discussions with anyone, including Ms. Rabinowitz, on whether the judgment should be appealed. (August 18, 1999, Cohen Decl. at ¶¶ 4–7.) Ms. Rabinowitz also testified that she could not recall any discussions with Mr. Cohen regarding the October 1992 letter, the Claims Court judgment, or whether the judgment should be appealed. (Rabinowitz Dep. at 22–35.) According to the Defendant, no documents exist relating to the decision on whether to pursue an appeal of the prior Claims Court judgment. (Pl.'s Supp. Ex. 103.)

### E. The Virginia State Tax Refund

In April 1991, the Plaintiff initiated an administrative proceeding before the State of Virginia Tax Commission protesting the inclusion of the Himont capital gain in its Virginia taxable income. On June 27, 1995, the Plaintiff and Virginia entered into a settlement agreement in which Virginia agreed to pay the Plaintiff $10.5 million in exchange for the Plaintiff's agreement to dismiss its protest. The settlement agreement itself contained the following provision: "This agreement constitutes the sole agreement between the Taxpayer and the Department with regard to the refund claim and all issues related to, or arising from, the refund claim." (Pl.'s Ex. 84 at 2.) Subsequently, the Plaintiff and the contracting officer engaged in a series of discussions concerning whether the Defendant was entitled to share in the refund that the Plaintiff received from Virginia in 1995 and, if so, what the Defendant's share should be. The position of the contracting

officer, which is the same position that the Defendant presently makes, is that the 1995 payment constituted a reduction of the Plaintiff's 1987 state income and franchise tax costs and that, therefore, the payment should be determined on the basis of the 1987 Virginia apportionment factors.

The Plaintiff accounted for the $10.5 million settlement as $5.25 million in a tax refund and $5.25 million in interest payments from Virginia. The Plaintiff made two central claims about the 1995 Virginia refund. First, it took the position that the Defendant was not entitled to share in any of the $10.5 million because Hercules had been paid from the Judgment Fund as a result of the litigation in *Hercules I.* Second, to the extent that the Defendant was entitled to share any of the $10.5 million, the share should be determined on the basis of the 1995 Virginia apportionment factors.

### F. The Defendant's Demand for Share of the 1995 Virginia Income Tax Refund

The negotiations between the parties failed. On December 31, 1996, the Defendant issued a demand letter to the Plaintiff in which it demanded that the Plaintiff "refund to the Government 55% of the $10.5M refund or $5,775,000." (Def.'s Ex. 4.) The amount was based upon the 1987 Virginia apportionment factors. The Plaintiff refused to pay.

Additional negotiations took place. The Plaintiff offered to pay the Defendant $880,000 to settle the issue. However, the Contracting Officer issued a Final Decision on October 1, 1997, finding that the Plaintiff owed the Defendant $4,725,000 and demanding payment, or 45 percent of the refund for the 1987 Virginia state income tax. The basis for the Contracting Officer's decision, so he claimed, was that the Plaintiff never historically treated a tax refund as a reduction in its tax expense in the year in which the refund was received and *Grumman Corp. v. United States*[4] demanded that the tax credit be allocated according to the 1987 apportionment factors. The Plaintiff then

filed a complaint with the Court on February 18, 1998.

The Defendant filed a counterclaim on May 4, 1998, in the amount of $3,845,000, which is the amount claimed in the Contracting Officer's Final Decision less the Plaintiff's $880,000 payment.

Subsequent to the filing of the complaint, the Plaintiff made two separate payments to the Defendant. First, it paid $880,000 on March 13, 1998 (the same amount as the settlement offer). Second, on April 15, 1999, the date of the filing of the Plaintiff's motion for summary judgment before the Court, the Plaintiff paid the Defendant $41,710.72.

### II. Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS,* 998 F.2d 979 (Fed. Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 248, 106 S.Ct. at 2510. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The court must resolve any doubts about factual issues in favor of the non-moving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1307 (Fed.Cir.1998) and draw all reasonable inferences in its favor. See *Gasser Chair Co. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773 (Fed.Cir.1995).

The fact that both parties have moved for summary judgment is not an admission that no material facts remain in issue. *Massey v. Del Laboratories, Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997). See also *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed. Cir.1988). Summary judgment will not necessarily be granted to one party or another

---

**4.** 218 Ct.Cl. 441, 587 F.2d 498 (1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2837, 61 L.Ed.2d 283 (1979).

simply because both parties have moved for summary judgment. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed.Cir. 1998). Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Cincom Systems, Inc. v. United States*, 37 Fed. Cl. 663, 671 (1997).

The Court reviews decisions by a contracting officer de novo. 41 U.S.C. § 609(a)(3).

### III. Grounds for Summary Judgment

The Defendant provides two major arguments why summary judgment should be granted in favor of the Defendant. First, the Defendant requests that the Court apply the doctrine of equitable estoppel against the Plaintiff by preventing it from challenging the Defendant's use of the 1987 apportionment factors in determining the amount of the 1995 refund. It seeks this defense because of the representations made in the October 8, 1992, letter from David Cardillo. Second, the Defendant claims that the refund must be calculated according to the 1987 apportionment factors because *Grumman Aerospace Corporation v. United States*[5] is controlling precedent in this case. As a subsidiary matter, the Defendant argues that the Defendant is entitled to all of the 1995 Virginia refund even to the extent that the Court characterizes part of the refund as a payment of interest. Finally, the Defendant

argues that the Plaintiff is not entitled to recover any of its legal fees expended in connection with *Hercules I*.

### IV. Whether the Plaintiff is Estopped from Challenging the Defendant's Use of 1987 Ratio of Apportionment Factors

The Defendant claims that the Plaintiff should be estopped from claiming that the 1995 ratio of apportionment factors should determine the amount of the refund owed to the Defendant. It claims that the Cardillo letter, which as described above stated that the Defendant would be given a credit "in the same proportion or percentage as the 1987 charge" was relied upon by the Defendant and was a significant factor in the decision of the Defendant's counsel not to pursue an appeal in *Hercules I*. (Rabinowitz Decl. at ¶ 9.) The methodology of calculating the amount of the refund that the Defendant would share, as represented by the Cardillo letter, is virtually the same as what the Defendant seeks in this case. The Plaintiff claims that equitable estoppel does not apply for several reasons. First, it argues that Ms. Rabinowitz was not in fact the person who made the decision not to appeal, but rather the decision not to make the appeal was in fact made by David Cohen, Director of the Commercial Litigation Branch of the Department of Justice ("DOJ") and her reviewer, who testified that he does not recall seeing the letter.[6] Second, it argues that the Cardillo letter cannot be a significant factor in the Defendant's decision not to appeal *Hercules I* because Mr. Cohen lacked the requisite legal authority to make that decision for the Government.[7] Third, even if the Defen-

---

5. *See supra* note 4.

6. Although the Court does not decide on this basis that estoppel does not apply, the Court notes that it is highly unlikely that Mr. Cohen would have made a decision not to appeal in this case without input from the trial attorney. Although Mr. Cohen cannot recall any of the reasons why an appeal was not taken in this case, nor can he remember any discussions about this case with anyone, including Ms. Rabinowitz, the memory lapses and lack of documentation is most easily explained by the 6–year time lapse

between when the decision not to appeal was made and the date of his declaration.

7. Specifically, the Plaintiff points out that the authority to "[d]etermine whether, and to what extent, appeals will be taken by the Government to all appellate courts" is vested in the Solicitor General of the United States. 28 C.F.R. § 0.20(b) (1981). Although the Solicitor General may delegate this authority to Mr. Cohen, there is no evidence that any such written delegation existed in 1992. However, Mr. Cohen contends that he possessed this authority prior to the enactment of the Federal Courts Improvement Act

dant could prove that the letter was a significant factor in a decision not to appeal, that fact alone would be insufficient to satisfy the requirements for equitable estoppel. It is this argument to which the Court now turns.

■ In order for the Court to apply equitable estoppel, these elements must be established:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Emeco Industries, Inc. v. United States,* 202 Ct.Cl. 1006, 1015, 485 F.2d 652 (1973). An explicit representation is not a necessary precondition for a finding of equitable estoppel. Estoppel can lie for a course of conduct, without misrepresentation, by the estopped party. "This latter view is in accord with those cases that hold that a party who engages in a course of conduct, even without misrepresentation, upon which another party has a right to believe he is intended to act or upon which the first party intends him to act, will be estopped from repudiating the effect of such conduct." *Id.* (*citing United States v. Georgia-Pacific Co.,* 421 F.2d 92, 96 (9th Cir.1970)).

■ The Court finds that the Defendant has failed to establish that the Plaintiff's counsel "knew the facts"; specifically, that the Defendant intended to rely on the statement in the Cardillo letter (in which it stated that it would calculate any possible tax refund from the Himont sale in accordance with the method requested by the Defendant) in its decision not to appeal the judgment in *Hercules I.* Nowhere does the Cardillo letter or the Kipp cover letter suggest that it understood that the Government would rely on the content of the letter in a decision on whether to appeal. Although Ms. Rabinowitz testified that the content of the Cardillo letter was a "significant factor" in the decision not to appeal *Hercules I,* there is no contemporaneous evidence that suggests that Ms. Rabinowitz communicated to Mr. Kipp that the Cardillo letter was in any way related to the DOJ's decision not to appeal, or that the Plaintiff's counsel in fact knew that the DOJ was actively considering an appeal. Furthermore, as stated earlier, Ms. Rabinowitz had already stated to the Claims Court in *Hercules I,* that if Judge Wiese were to rule in the way that he indicated, there would be no appeal by the Government. (January 14, 1992, Tr. at 71.) Judge Wiese did in fact rule along the lines that he indicated at the January 14, 1992, oral argument; namely, that he upheld the "pool" or "surrogate" method of allocating tax costs to seg-

---

of 1982 on the grounds that in the former Court of Claims the division between the Trial Division (judges appointed by the Court) and the Appellate Division (Article III judges) was informal and not by statute. "The trial judges would conduct trial proceedings (fact finding) and would issue 'recommended decisions.' A recommended decision would become the decision of the court unless either party filed 'exceptions.'" (September 10, 1999, Cohen Decl. at ¶ 5.) Thus, "a proceeding before the judges of the Court of Claims upon exceptions was not a true 'appeal' because the proceeding was simply a continuation of the case in a single court." *Id.* at ¶ 6. Since these exceptions were not true appeals, so Mr. Cohen argues, he was entitled to decide whether or not to file an exception. *Id.* The Federal Courts Improvement Act of 1982 did not, in Mr. Cohen's view, affect his legal authority to elect not to prosecute an appeal in at least certain instances.

Mr. Cohen testified that the Commercial Litigation Branch both prior to and after the enact-

ment of the Federal Court Improvement Act in 1982 used the following procedure in determining whether or not to appeal an adverse decision. The trial attorney writes an adverse decision memorandum to the Director. If the Director agrees, a memorandum requesting authority to appeal is prepared for the Solicitor General. If the Commercial Litigation Branch and the client agency have a disagreement on whether an appeal should be pursued, a memorandum is likewise prepared for the Solicitor General for his consideration. However, if the client agency and the Commercial Litigation Branch both agree that an appeal should not be prosecuted, the final decision is made by the Director. *Id.* at ¶¶ 7-8.

The Court does not need to address the issue of whether Mr. Cohen had the legal authority to decline to appeal a decision by the Court of Federal Claims in order to decide that equitable estoppel should not be applied in this case. Nevertheless, for future reference, the Court wishes to apprize the legal community of the apparent existence of this curious procedure by the Department of Justice.

ments other than the Radford, Virginia, or Sunflower, Kansas, plants so long as the results of the allocation would be approximately the same as that if a direct allocation method were employed. *See Hercules, Inc.*, 26 Cl.Ct. at 665–66. It would be entirely reasonable for the Plaintiff's counsel to believe that the Defendant had already decided not to appeal the decision because of Ms. Rabinowitz's representations. While the representable contained within the Cardillo letter were misleading, the Defendant cannot establish in this case that the Plaintiff "knew the facts" upon which the Defendant allegedly relied on.

Therefore, the Court, reluctantly, declines to apply the doctrine of equitable estoppel against the Plaintiff.[8]

## V. Whether the Refund Owed to the Defendant Must Be Calculated According to the 1987 Ratio of Apportionment Factors

### A. The Defendant's Argument That *Grumman* Mandates That the Defendant's Share of the 1995 Refund Be Determined in Accordance with the 1987 Apportionment Factors

The Defendant argues that the refund that is owed to it must be calculated in the same proportion as was used to calculate the amount of taxes it reimbursed the Plaintiff.[9] It cites for this proposition the rarely cited case of *Grumman Aerospace Corporation v. United States*,[10] which it maintains is binding precedent on this Court and directly on point. Indeed, the facts of *Grumman* are so very similar to this case that the Court will elaborate on them at length.

In *Grumman*, the plaintiff (Grumman) brought before the Court of Claims a Wunderlich Act review of an adverse decision by the Armed Services Board of Contract Appeals (ASBCA).[11] Grumman had a cost-plus-incentive fee contract with the Navy. *Grumman*, 218 Ct.Cl. at 445, 587 F.2d 498. Grumman incurred a New York State franchise tax cost of $1,807,870 for the year 1968. *Id.* at 446, 587 F.2d 498. This tax cost was an element of general and administrative (G & A) expense to Grumman. *Id.* at 445–46, 587 F.2d 498. Its G & A expense pool was allocated to individual contracts on the basis of their total cost input at the time the G & A expense was incurred. The Navy reimbursed Grumman for that tax for the year 1968. *Id.* at 446, 587 F.2d 498. In early 1972, Grumman filed with the State of New York a claim for a credit or refund of that tax. Later that year, Grumman received from the State of New York "a credit or a payment of $1,609,000 (including interest)." *Id.* at 447, 587 F.2d 498.

Grumman and the Defense Contract Audit Agency (DCAA) discussed how this credit was to be allocated to the contracts and for which time period. The parties agreed that the tax credit should be allocated to its various subsidiaries on the basis of the ratio of the net income or loss of each subsidiary to Grumman's total loss. However, the parties disagreed as to "whether [the] credit or refund [was] to be allocated to contracts on the

---

8. The Plaintiff also argues that in order for estoppel to be properly applied in this case, the Defendant must prove that had it taken an appeal of the decision to the Federal Circuit, it would have been successful. Because the Court has declined to apply equitable estoppel in this case on other grounds, this particular argument need not be addressed.

9. At an early stage of the proceeding, the Plaintiff appeared to argue that, as a threshold argument, the Defendant is not entitled to a share of the 1995 Virginia refund at all. However, the Plaintiff has abandoned that argument. (February 5, 2001, Tr. at 5.) Therefore, the Court assumes that the Defendant is entitled to a share of the refund, and that the issue before the Court is how that share of the refund is to be calculated

and to how much of the refund the Defendant is entitled.

10. *See supra* note 4.

11. Under the Wunderlich Act standard of review, a final decision by a contract officer shall be upheld "unless the same is fraudulent [sic] or capricious or arbitrary or so grossly erroneous as necessary to imply bad faith, or is not supported by substantial evidence." 41 U.S.C. § 321. Under the CDA, the Court may review decisions by a contracting officer de novo. 41 U.S.C. § 609(a)(3). The difference in the standard of review, however, has no effect on the Court's analysis of the question of whether *Grumman* dictates that judgment be entered in favor of the Defendant.

basis of the participation of those contracts in [Grumman's] 1968 General and Administrative expense (G & A) input base or . . . on the basis of the participation of those contracts in [Grumman's] 1971 G & A input base." *Id.* at 441, 587 F.2d 498. The DCAA formally disapproved the contract costs. Grumman appealed to the ASBCA. The Court of Claims characterized the ASBCA's decision as follows:

> The [ASBCA] held that the "tax refund" was a "reduction of [Grumman's] 1968 franchise tax liability" and a "restitution of a portion of the tax paid in 1968, for which [Grumman] had been reimbursed by the Government in the proportion the Government's cost reimbursement contracts had been charged with [Grumman's G & A] expenses in that year"; that the "refund is 'properly allocable' to the 1968 tax payment * * *"; and that it should be credited to those "various contracts on the same basis as they were charged with the original 1968 tax payment."

*Id.* at 444, 587 F.2d 498 (*quoting Grumman Aerospace Corp.*, ASBCA No. 18,590, 75–2 BCA ¶ 11,492 at 54,831 (1975)).

Although Grumman claimed that "sound accounting logic" and the generally accepted accounting principles (GAAP) demonstrated that the ASBCA made an erroneous decision, the Court of Claims upheld it. The Court of Claims noted that the language of the contract and the ASPR cost principles which were incorporated into the contract "have a common goal: 'both are concerned with assuring that if the Government pays a cost and later that cost is reduced, by whatever means, the Government receives the benefit of that reduction. This is fair and reasonable * * *.'" *Grumman*, 218 Ct.Cl. at 454, 587 F.2d 498 (*quoting RMK–BRJ*, ASBCA No. 16,031, 74–1 BCA ¶ 10,535 at 49,896). The Court further stated:

> Plaintiff's 1968 franchise tax costs having been reduced by a subsequent refund, defendant is contractually entitled to its proper share of that reduction computed on the basis of its 1968 reimbursement of costs.

\*\*\*

> Without regard to how GAAP and sound accounting logic might treat the refund for income tax accounting purposes, the contract language controls here.

*Id.* at 456.

The Plaintiff, like Grumman, paid a tax which was later reimbursed by the Defendant based upon a methodology in which the tax cost was calculated in accordance with the apportionment factors that existed in the year in which the cost was incurred. Later, the Plaintiff (again like Grumman) received a refund of the same tax. Accordingly, the Defendant insists that (following the precedent in *Grumman* ) the Court must hold that the refund is a reduction of the tax cost and that the Defendant is entitled to receive "its proper share of that reduction computed on the basis of its reimbursement of such costs." *Id.* Thus, the Defendant argues:

> In short, the Government's share of the refund received by Hercules must be based upon the same set of operative facts as the initial payment was calculated. The law and the logic work hand in glove here. To calculate the Government's original liability using one standard and the Government's share of the refund using a different standard leads to absurd and inequitable results.

(Def.'s Reply at 6–7.)

Moreover, the Defendant argues that, following *Grumman,* the language of the contract itself demands that the refund must be calculated according to the 1987 apportionment factors even if the Plaintiff had a consistent practice of allocating tax credits in the year with the apportionment factors in which the refund was received (which the Defendant disputes in any event). The "credits" clause of the FAR, which is incorporated into the contract, requires that the "applicable portion" of a "credit" that is allocable to a cost must be treated as a "cost reduction." 48 C.F.R. § 31.205–41. In this case, the tax refund or credit at issue is allocable to 1987 Virginia state income tax costs originally charged to the Defendant. Therefore, the refund must, by the terms of the contract itself, be treated as a reduction

of that 1987 cost and calculated according to the apportionment factors of 1987.

Similarly, the "ALLOWABLE COST AND PAYMENT" clause of the FAR, which is incorporated into the contract, states that refunds received by the contractor will be paid to the Defendant when the refund relates to a cost which had been previously reimbursed. The clause reads in relevant part: "The Contractor shall pay to the Government any refunds ... (including interest, if any) accruing to or received by the Contractor ... to the extent that those amounts are properly allocable to costs for which the Contractor has been reimbursed to the Government." 48 C.F.R. § 52.216–7.

When the allowable cost and payment clause and the credits clause are read together, the Defendant argues, it becomes clear that there must be a connection or nexus between the refund and the allowed cost. Any other reading of the clauses would be nonsensical. (February 8, 2001, Tr. at 75.) Without such a nexus to previously allowable and paid costs, the Defendant would not be entitled to a refund at all.

B. The Plaintiff's Argument That *Grumman* Does Not Apply to These Contracts and That CAS 406 and 410 Require That the Defendant's Share of the 1995 Refund Be Determined by the 1995 Apportionment Factors

The Plaintiff, however, states that *Grumman* is not binding on the Court for the following reasons. First, it argues that the holding of *Grumman* would not apply in a case in which the contractor had a consistent cost accounting practice of assigning refunds of prior year state income taxes to the tax costs of the year in which the refunds were received. Because Grumman had never established any practice of allocating state tax refunds, much less a consistent one, there was no basis for applying the rule against retroactive accounting practice changes as described in *Litton Systems, Inc. v. United States*, 196 Ct.Cl. 133, 449 F.2d 392 (1971). However, the Plaintiff argues that it did in fact have a consistent cost accounting practice of assigning refunds to the tax costs of

the year in which it was received, the *Litton* rule against retroactive accounting changes should be applied.

Second, the Plaintiff claims that *Grumman* itself may not be good law because the Court of Claims itself has recognized that its rulings based on the Armed Services Procurement Regulations (ASPR) may not be valid since the adoption of the CAS. In *Boeing Company v. United States*,[12] the Court of Claims held that a prior Claims Court decision which held that a "headcount method" of allocating tax costs to segments complied with ASPR was no longer valid upon the promulgation of the new requirement of CAS 403 which specifically required that costs be allocated directly to segments. *Boeing* 230 Ct.Cl. at 669–70, 680 F.2d 132. Because Boeing's "headcount method" was not a direct allocation method, the earlier Court of Claims decision was not applicable.

The contracts at issue in *Grumman* were entered into prior to enactment of the CAS. However, the contracts at issue in this case are subject to the CAS. Therefore, according to the Plaintiff's argument, the requirements of CAS 406 and CAS 410 are new requirements on this contract that preclude the Court from holding that *Grumman* is controlling precedent in this case.

Moreover, the Plaintiff argues that CAS 406 and CAS 410 mandate that the calculation of the refund of 1987 Virginia state income tax be made on the basis of the 1995 apportionment factors. The Plaintiff's argument goes as follows: The purpose of CAS 406, which is entitled "Cost Accounting Period," is

> to provide criteria for the selection of time periods for contract costs estimating, accumulating, and reporting. This standard will reduce the effects of variations in the flow of costs within each accounting period. It will also enhance objectivity, consistency, and verifiability, and promote uniformity and comparability in contract cost measurements.

48 C.F.R. § 9904.406–20.

Under the heading of "Fundamental Requirements," CAS 406–40(a) requires that

---

12. 230 Ct.Cl. 663, 680 F.2d 132 (1982).

"[a] contractor shall use this fiscal year as his cost accounting period ..." 48 C.F.R. § 9904.406–40(a). "Fiscal year" is defined by the CAS as "the accounting period for which annual financial statements are regularly prepared, generally a period of 12 months, 52 weeks, or 53 weeks." 48 C.F.R. § 9904.406–30(a)(3).

CAS 406–40(b) states that a contractor:

shall follow consistent practices in his selection of the cost accounting period or periods in which any types of expense and any types of adjustment to expense (including prior-period adjustments) are accumulated and allocated.

48 C.F.R. § 9904.406–40(b). The Plaintiff claims that it has followed a consistent practice of including refunds of state income taxes as part of the tax costs of the year in which the refund was received.

CAS 406–40(c) requires that:

The same cost accounting period shall be used for accumulating costs in an indirect cost pool as for establishing its allocation base, except that the contracting parties may agree to use a different period for establishing an allocation base as provided in 9904.406–50(e).

48 C.F.R. § 9904.406–40(c). This requirement, which means that a contractor must use the same accounting period for accumulating a cost in an "indirect cost pool" as allocating a cost, would, according to the Plaintiff, mandate that the correct allocation base period is 1995 because the accounting period for the 1995 payment was calendar year 1995.

Finally, CAS 410–40(b)(1) requires:

The G & A expense pool of a business unit for a cost accounting period shall be allocated to final cost objectives of that cost accounting period.

48 C.F.R. § 9904.410–40(b)(1). The common thread among all of these CAS requirements, according to the Plaintiff, is that it must use the same period for assigning and allocating

an indirect cost such as state income tax refunds.

## C.   Analysis

### 1.   Whether *Grumman* Applies to Contracts Subject to the CAS

■■■ The fundamental flaw in the Plaintiff's argument is that it assumes that a tax refund is an indirect cost. It is not. A tax refund is a *credit* for a *previously recognized and allocated* indirect tax cost. *See CIBINIC AND NASH,* COST–REIMBURSEMENT CONTRACTING 675 (2nd Ed.1993) (*citing Grumman Aerospace Corporation v. United States, supra* note 4). It is true that CAS 406–40(b) demands that a contract follow a consistent practice in selecting a period to accumulate and allocate adjustments, including prior period adjustments. It is likewise true that CAS 410 requires that a G & A expense be allocated to the cost of the period for which it was entered. However, CAS 410 does not state any specific requirement as to how *credits* for G & A expenses will be allocated. Likewise, CAS 406 does not anywhere state that a credit to an expense of a prior period must be allocated to the year in which the credit was received. The absence of such a requirement in the CAS is sensible because if a tax refund were treated as a separately allocable cost that had to be allocated according to the allocation base of the year in which the refund was received, there would be no nexus·between the cost and the credit relating to that cost. Further, such a requirement would directly conflict with the "credits" clause of the FAR which specifically mandates that the "applicable portion" of a credit would be treated as a reduction of a cost.[13] Likewise, the FAR taxes clause mandates that the credit due to the Defendant is determined in reference to taxes and interest that have been paid by the Defendant as allowable contract costs. 48 C.F.R. § 31.205–41. Hence, under the FAR, a tax credit is treated as a reduction of a pre-existing cost, but not as a cost itself.

---

**13.** At oral argument, the Plaintiff directed the Court's attention to *United States v. Boeing Co.,* 802 F.2d 1390 (Fed.Cir.1986), for the proposition that if a provision of the CAS and an acquisition regulation were to conflict, the CAS provision would control. (Feb. 8, 2001 Tr. at 108.) The Court does not find that the FAR "credits" or "taxes" conflict with the CAS because CAS 406 and 410 do not any way require that tax refunds be allocated as an independent indirect cost.

A further problem with allocating the refund of 1987 Virginia state income tax according to the 1995 Virginia apportionment factors is that any share in the proceeds by the Defendant would be entirely fortuitous. If the Virginia apportionment factors were to be consistently applied in the year in which the refund was received, the Defendant would not receive any share of the income tax credit if Plaintiff had no contracts with the Defendant in the State of Virginia in that particular year. On the other hand, if the Plaintiff were to have a greater number of contracts with the Defendant in Virginia in the year in which it received its tax refund than it did in the year in which the tax cost was incurred, the Defendant would be overcompensated for its cost reimbursement. A rational cost accounting system would not permit the allocation of a credit of a reimbursed cost to be predicated on such contingencies. Such a cost accounting practice would turn the FAR Taxes, Credits, and Allowable Costs and Payment clauses into meaningless contractual provisions. *See Blake Constr. Co., Inc. v. United States*, 987 F.2d 743, 746–47 (Fed.Cir.1993) ("An interpretation which gives reasonable meaning to all parts of a contract is preferred to one which renders part of it insignificant or useless"). Therefore, the Court finds that CAS 406 and 410 do not require that the credit of the previously allocated 1987 Virginia tax cost be allocated according to the 1995 Virginia apportionment factors.

Likewise, because CAS 406 and CAS 410 do not require application of the 1995 Virginia apportionment factors, then the enactment of CAS cannot invalidate the holding of *Grumman* at least in this particular instance. *Boeing v. United States*,[14] only stands for the proposition that a Court of Claims ruling which interprets the ASPR but is issued prior to the enactment of the CAS may be abrogated when the CAS imposes an additional requirement beyond the ASPR. Because the Court finds that the CAS imposes no new and specific requirement on the con-

tract or directly contradicts any prior Court of Claims decision, *Boeing* is inapposite.

Therefore, the Court holds that the teaching of *Grumman;* namely, that if the Government pays a cost of a contractor and that later that contractor receives a credit or refund of that cost, the Government receives the benefit of that reduction, in proportion to how that cost was initially calculated, is applicable to contracts governed by the CAS. Thus, the Court holds that the teaching of *Grumman* is controlling in this case.

2. Whether the *Litton System* Rule Against Retroactive Cost Accounting Changes Should Be Applied

The Court is convinced by the Defendant's argument that the facts of *Grumman* are virtually indistinguishable from this case insofar as the allocation base of credit of a previously allowed cost should be calculated in accordance with the manner that the allocation based of the previously allowed cost was calculated. However, the *Grumman* court refused to apply a rule in *Litton Systems*, in which a contractor in some instances is not required to make a retroactive change in a cost allocation method which was determined to be incorrect. *Grumman*, 587 F.2d at 502.[15] The *Litton Systems* rule is that the Government cannot force a contractor to make a retroactive change of an incorrect cost allocation method if: (a) the contractor has had "a long and consistent use" of the allocation method in question and (b) the contractor was "unduly prejudiced" by failing to receive reasonably adequate notice that the Government would no longer approve of that method. *Litton Systems*, 196 Ct.Cl. at 148, 449 F.2d 392. *See also McDonnell Douglas Corp. v. United States*, 40 Fed.Cl. 529, 549–50 (1998), *rev'd on other grounds*, 182 F.3d 1319 (Fed.Cir.1999) (*Litton Systems* rule applied to allocation of material handling costs on the grounds that the allocation was reasonable).

The *Litton Systems* rule is predicated on the fact that ASPR cost regulations do not

14. *See supra* note 12.

15. The *Grumman* court refers to the *Litton Systems* rule as an "estoppel argument." 587 F.2d at 502. This kind of "estoppel" should not be

confused with the doctrine of equitable estoppel. The *Litton Systems* rule would be better characterized as an "unfair prejudice" rule.

94

prescribe exact accounting procedures for government contracts, but are subject to a standard of flexibility and reasonableness. As *Litton Systems* states:

> Thus if a contractor's own accounting system will be acceptable if it conforms to "generally accepted accounting principles" and if it meets the other general requirements of the regulations. This theme of flexibility, recurring throughout the cost principles, is especially apparent in Part 2 of these regulations, around which the dispute here is centered. Such terms as "reasonableness," "ordinary and necessary," "relative benefits," and "equitable," preclude the application of any general rule or litmus test. *Lockheed Aircraft Corp. v. United States, supra.* Rather we think the cost principles require us to search for a result which, as we said in *Lockheed*, is "fair and reasonable." Id., 375 F.2d at 796, 179 Ct.Cl. at 563. Such a standard seems especially appropriate here, where the Government seeks to retroactively impose upon plaintiff a new allocation method.

*Litton Systems*, 196 Ct.Cl. at 145–46, 449 F.2d 392. Thus, the *Litton Systems* rule is a flexible rule designed to promote considerations of fairness, reasonableness, and equity in determining whether a retroactive change should be applied in a given case.

■ It appears that the *Grumman* court may have refused to apply *Litton Systems* because Grumman did not sufficiently establish that it had a consistent practice of applying the allocation base of franchise tax credits in the year in which they were received. The Plaintiff's motion for summary judgment sets out a detailed argument that it did have such a consistent practice. However, the Court need not decide in this instance that the Plaintiff did have such a practice because the considerations of fairness, reasonableness, and equity favor the Defendant even if the Plaintiff had a consistent practice of calculating credits with an allocation base of the apportionment factors of the year in which the credit or refund was received.

First, the Plaintiff's allocation method was not reasonable. As stated earlier, to calculate the original tax cost according to one standard and then calculate a credit of that cost using a different standard leads to results that are entirely fortuitous. It so happens that, in this particular instance, the Plaintiff obtains a windfall by applying the 1995 Virginia apportionment factors. However, given the contingent nature of future business relationships with the Government, it would be equally possible that the Plaintiff could be short-changed in sharing income tax refunds with the Government had the 1995 Virginia apportionment factors pointed in the opposite direction.

Second, and more importantly, the Plaintiff cannot claim unfair prejudice because the Plaintiff itself represented to the Department of Justice in the October 1992 Cardillo letter that it would employ the 1987 apportionment factors to any refund that it received. The Cardillo letter stated the following:

> As you know, we have a two-step allocation procedure, which first determines the allocable amount to the GOCO locations (Radford and Sunflower). If a refund is received from the State of Virginia, the Radford contract would be given credit for an amount of the refund in the same proportion or percentage as the 1987 charge.

(Pl.'s Ex. 92 at G 200002.)

Although the Court has ruled that the doctrine of equitable estoppel does not apply to the Cardillo letter in this case, the Cardillo letter is still relevant to issues of equity and fairness in determining whether a retroactive change in allocation methodology should be ordered. A finding of equitable estoppel is not necessary for the Court to decline to apply the *Litton Systems* rule in this instance. Here, at the specific request of the Defendant, the Plaintiff represented that it would apply the 1987 Virginia apportionment factors. At the moment that it submitted the letter, the Plaintiff was effectively on notice that it would need to calculate any refund of its 1987 Virginia state income tax costs according to the 1987 apportionment factors. In balancing the equities, the Court finds that the letter provided the Defendant with a reasonable expectation that the 1987 apportionment factors would be applied if the Plaintiff received a refund from the State of Virginia. Hence, the Plaintiff cannot say

that it was unfairly prejudiced by the contracting officer's final decision to apply the 1987 apportionment factors to the 1987 refund. Therefore, the Court holds that it would be inappropriate to apply the *Litton Systems* rule against retroactive accounting changes in this instance.

■ Therefore, the Court holds that the Defendant's share in the 1995 refund is to be calculated according to the 1987 Virginia apportionment factors.

## VI. Whether the Portion of the Refund of 1987 Virginia State Income Taxes Characterized by the Plaintiff as Interest Is to Be Shared with the Defendant

■ In its complaint, the Plaintiff claims that the Defendant is not entitled to share in the portion of the $10.5 million settlement proceeds that it characterizes as interest that accrued over the period (April 1988 to December 1992) during which it was not reimbursed by the Defendant for its 1987 Virginia income tax expense. (Comp. at ¶ 25.) The Plaintiff argues that the FAR "Taxes" provision provides that "any interest paid or credited to a contractor incident to a refund of tax ... shall be paid or credited to the Government only to the extent that such interest accrued over the period during which the contractor had been reimbursed by the Government for the taxes, interest, or penalties." 48 C.F.R. 31.205–41(d). The Plaintiff asserts that one half of the $10.5 million settlement with the State of Virginia is in fact interest incident to the refund of 1987 Virginia income taxes. It bases its argument by means of an affidavit by David Peirson who negotiated the settlement agreement for the Plaintiff with the State of Virginia. Peirson claims (without documentary evidence) that both Hercules and Virginia at the conclusion of its negotiations viewed the settlement as a $^{50}$/$_{50}$ split between a refund of taxes and interest incident to a refund. (Peirson Affidavit at ¶ 14.)

The Defendant first argues that the plain language of the settlement agreement between the Plaintiff and the State of Virginia demonstrates that the settlement agreement was an integrated agreement which made no

distinction between refund and interest, and that the Peirson affidavit is parol evidence that is inadmissible to "vary, contradict, or add to the terms of an integrated contract." *Applied Companies v. United States,* 37 Fed. Cl. 749, 759 (1997), *aff'd* 144 F.3d 1470 (Fed. Cir.1998). Second, it argues that even if the settlement agreement contemplates a payment of interest, the Plaintiff had already reimbursed for interest on the claim when it received CDA interest from July 26, 1988, in its judgment against the Defendant in *Hercules I.* (Pl.'s Ex. 82.) Any awarding of interest to the Plaintiff pursuant to the refund would result in double-recovery for the Plaintiff.

The Court agrees with the Defendant that, even if the settlement agreement contemplates a payment of interest, the Plaintiff has already been reimbursed for all the interest that it had accrued from July 1988 until December 1992. Therefore, the Defendant would be entitled to share in any "interest" that was contemplated by the State of Virginia and the Plaintiff. The Plaintiff's counter-argument that CDA interest and the interest component of the Virginia payment are based on different statutes, with different purposes, is nonsensical and is no more than a distinction without a difference. None of the Plaintiff's arguments changes the fact that it has been reimbursed for interest on its income tax claim as of December 1992. To the extent that the settlement agreement contemplates payment of interest, the amount of interest would represent the years 1988 through 1995, and the Defendant is entitled to it.

## VII. Whether the Plaintiff is Entitled to Be Reimbursed for Its Legal Expenses That It Incurred in Obtaining a Judgment in *Hercules I*

The Plaintiff claims that it incurred $485,457.79 in attorneys' fees and related expenses for having to prosecute its claim for reimbursement of 1987 Virginia income taxes in *Hercules I,* in which it prevailed. Therefore, it argues that equity demands that the Plaintiff's attorneys' fees and expenses be deducted from the Defendant's share of the 1995 refund.

However, the Defendant argues, and the Plaintiff concedes, that the Plaintiff was not entitled to attorneys' fees pursuant to 28 U.S.C. § 2412 because it did not meet the definition of "party" in that statute. 28 U.S.C. § 2412(d)(2)(B). Second, the Defendant argues, and the Plaintiff concedes, that attorneys' fees incurred in prosecuting a claim against the Government are not allowable costs pursuant to its contract. 48 C.F.R. § 31.205–47(f)(1). Because there is no legal basis for obtaining attorneys' fees in *Hercules I,* the Court declines to award them to the Plaintiff.

## VIII.  Conclusion

Therefore, the Court GRANTS the Defendant's cross-motion for summary judgment. Because the Court has granted the Defendant's cross-motion, the Court DENIES the Plaintiff's motion for summary judgment. The Clerk of the Court is directed to dismiss the Plaintiff's complaint with prejudice and enter judgment in favor of the United States in the amount of $3,803,289.28 plus interest as provided by law.

**IT IS SO ORDERED.**